[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Garrett*, Slip Opinion No. 2022-Ohio-4218.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-4218

THE STATE OF OHIO, APPELLEE, *v*. GARRETT, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Garrett*, Slip Opinion No. 2022-Ohio-4218.]**

*Criminal law—Aggravated murder—Findings of guilt and death sentence affirmed.*

(No. 2019-1381—Submitted June 15, 2022—Decided November 30, 2022.)

APPEAL from the Court of Common Pleas of Franklin County,

No. 18CR-168.

_____

FISCHER, J.

{¶ 1} This is an appeal of right from an aggravated-murder conviction and death sentence. A Franklin County jury found appellant, Kristofer Garrett, guilty of the aggravated murders of his four-year-old daughter, C.D., and her mother, Nicole Duckson, with accompanying death-penalty specifications. The jury recommended a sentence of death for the aggravated murder of C.D., and the trial court sentenced Garrett according to the jury's recommendation. The court also

sentenced him to life without parole for the aggravated murder of Nicole. We affirm Garrett's convictions and death sentence.

## I. TRIAL EVIDENCE

### A. Prosecution's evidence

*1. Murders of Nicole and C.D. in their driveway*

{¶ 2} In January 2018, Nicole and C.D. lived in Columbus with Clifton Duckson Sr., Nicole's father. Nicole would normally carpool to work with her friend and coworker, Amberly Reid, and drop off C.D. at childcare.

{¶ 3} At 6:27 a.m. on January 5, 2018, Nicole sent Reid a text message stating that she would pick Reid up between 7:10 and 7:15 a.m. When Nicole failed to arrive, Reid texted Nicole, but Nicole did not respond. Reid then drove to Clifton's house to make sure everything was alright. Upon arrival, Reid found Nicole's and C.D.'s bodies covered in blood and lying on the driveway next to Nicole's car. Reid then called 9-1-1.

{¶ 4} Police officers arriving at the scene found Nicole's and C.D.'s dead bodies. Blood, clumps of hair, and items from a purse and a child's backpack were found outside the back door of the home. Marks on the snowy driveway suggested that C.D.'s body had been dragged from the front of Nicole's car to its location next to Nicole's body. A trail of blood droplets also led down the driveway and along the street.

*2. Garrett's identification as the suspect and his arrest*

{¶ 5} Members of the Duckson family identified Garrett as a possible suspect. Garrett did not answer his phone when the police tried to reach him. The police learned that Garrett was at his Chatford Drive apartment in Columbus and that his driver's license had been suspended.

{¶ 6} Around 9:40 p.m. on January 5, as Garrett was driving away from his apartment, Columbus police officers stopped him for driving with a suspended license.

*3. Garrett's first police interview*

**{¶ 7}** On January 5 at 11:35 p.m., Detective James Porter, the lead investigator, and Sergeant David Sicilian interviewed Garrett at Columbus police headquarters. Police observed lacerations on the palm of Garrett's right hand and noted that the fingers on that hand had been stitched and bandaged.

**{¶ 8}** Garrett waived his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and agreed to speak to investigators. During a videotaped interview, Garrett stated that he had worked from 10:00 p.m. to 6:30 a.m. on January 5. Garrett said that after work, he cut his hand while taking a steak out of a package and stitched the wounds himself.

**{¶ 9}** Detective Porter informed Garrett that Nicole and C.D. had been stabbed to death. Garrett stated he was unaware that that had happened. Garrett said that he and Nicole had lived together for about a year but claimed that he had not talked to her since the past summer. Garrett denied that he had done anything to Nicole or C.D.

**{¶ 10}** As the interview progressed, Garrett discussed his relationship with Nicole. He stated that he was 19 and Nicole was 29 when they had started dating. According to Garrett, Nicole told him she could not get pregnant and did not want him to use condoms. And Nicole agreed to have an abortion if she did get pregnant. Thus, when Nicole gave birth to C.D., Garrett felt that he had been tricked.

**{¶ 11}** Garrett was also upset because Nicole said she would never request child support but then she did. Child-support payments were $600 a month. But Garrett's rent was $485 a month, and he also needed money for food, the gym, and gas for his car. Garrett said Nicole kept taking him to court and doing everything to "bring [him] down." Garrett said his driver's license was suspended because he had failed to pay child support. According to Garrett, a "disgruntled woman" was subjecting him to a "substandard" mode of living.

**{¶ 12}** Garrett added that Nicole had kept him from seeing C.D. He stated that Nicole tried to manipulate him by telling him that if he wanted to see C.D., he would have to have sex with her. Nicole told him that if "you can't see me, you can't see her." According to Garrett, the last time he saw C.D. was in May of the previous year. Garrett said it had reached the point where he felt that C.D. was not his daughter anymore.

**{¶ 13}** Toward the end of the interview, Garrett acknowledged that on January 5, he had left work early and drove to Nicole's house. He admitted that he had cut his hand at the crime scene and that it was his blood droplets on the driveway. Garrett stated that he did not know why he went to Nicole's house, that he should have never gone, and that he regretted it.

### 4. Garrett's second interview

**{¶ 14}** After he was transported to Grant Hospital for medical treatment, Garrett informed the guard that he wanted to speak with Detective Porter again. On January 7, Detective Porter conducted an audiotaped interview of Garrett at the hospital. After being reminded of his *Miranda* rights, Garrett said he wanted to make a full confession.

**{¶ 15}** Garrett stated, "I confess that I did kill Nicole Duckson and I did kill [C.D.]." Garrett said that after leaving work around 6:00 a.m., he went home and checked his email. He stated that had received an email regarding his delinquent child-support payments that indicated "they were going to be locking [him] up." Garrett became angry, took multiple shots of liquor, drove to Nicole's neighborhood, parked down the street from her house, and waited for her outside.

**{¶ 16}** Garrett said that when Nicole came out the door, he "just started stabbing her." Nicole yelled, "[P]lease, I'm sorry!" But Garrett said that "[i]n the back of [his] mind, [he] felt she wasn't sorry" because they had been in this situation too many times. C.D. then ran out and started screaming. Detective Porter asked whether Garrett killed C.D. because she had seen him stab her mom.

Garrett responded, "Yes, because of that." Garrett then went back to his car, put the knife in the trunk, and drove home.

{¶ 17} Garrett explained that he felt that he and Nicole "had argued enough" and that he had been unable to persuade her that he was "trying to get [his] feet on the ground." He said that he was trying to save money to start a food-truck business and that once he was able to start that business, he would have been able to pay child support. But, according to Garrett, Nicole "never wanted to hear it." Garrett added that he had been driving with a suspended license and would go to jail if he ever got into an accident. He believed that Nicole was trying to destroy his future.

{¶ 18} Garrett stated that he drove home and hid the knife and the clothes he was wearing in a "cubby hole" by the laundry room at his apartment complex. He then decided to drive to a Dayton hospital to have his hand treated. Garrett returned to Columbus and was driving to work when the police arrested him.

### 5. Murder weapon, bloody clothing, and bloodstains

{¶ 19} On the evening of January 7, Detective Porter and other officers found Garrett's bloodstained clothing and a bloodstained 12-inch hunting knife in a storage unit at Garrett's apartment complex. A few days later, the police searched Garrett's car and found possible bloodstains on the driver's seat, dashboard, and gear-shift knob.

### 6. Autopsies of C.D. and Nicole

{¶ 20} Dr. John Daniels, a forensic pathologist and Franklin County's deputy coroner, reviewed C.D.'s and Nicole's autopsies, which had been conducted by Dr. Donald Pojman.[1] Dr. Daniels testified that he agreed with Dr. Pojman's findings as to each victim.

---

1. Dr. Daniels testified that Dr. Pojman had been on medical leave for an extended period and that Dr. Pojman was still on medical leave at the time of Garrett's trial.

{¶ 21} C.D. suffered 33 sharp-force injuries. C.D.'s wounds included a 9.5-centimeter-long incised wound to the back of her head, a 10-centimeter-long incised wound that fractured her mandible and amputated the tip of her tongue, two stab wounds that penetrated her skull and entered her brain, and an incised wound that punctured her left jugular vein. C.D. had defensive wounds on the palms of her hands and on the side of her right hand. C.D.'s cause of death was multiple sharp-force injuries.

{¶ 22} Nicole suffered multiple stab wounds to her head, neck, and torso. She had a 3.7-centimeter-long wound on the right cheek, a 4.5-centimeter-long wound to her chest wall that left 400 milliliters of blood in her left thoracic cavity, three incised wounds on the left side of her head, and a small puncture wound to her right jugular vein. Nicole had several defensive wounds on her hands and wrists. Nicole's cause of death was multiple sharp-force injuries.

### B. Defense and rebuttal evidence

#### 1. Dr. Reardon's testimony

{¶ 23} Dr. James P. Reardon, a forensic psychologist, supported Garrett's plea of not guilty by reason of insanity ("NGRI") for the murder of C.D. Dr. Reardon testified that when Garrett was 13, he was diagnosed with "reactive attachment disorder of infancy or early childhood." According to Dr. Reardon, this disorder does not allow "normal attachment * * * of a child to significant people in their environment, typically mom and dad initially, maybe grandparents."

{¶ 24} Dr. Reardon testified that on looking at Garrett's history, there was "no mystery to how he got to where he got to." Garrett's father was in prison the entire time Garrett was growing up. At the age of three months, Garrett was removed from his mother's care and placed in foster care until he was two years old. He was placed in foster care again when he was 13 years old until he was 15. When Garrett was three-and-a-half years old, his infant brother died of sudden-

infant-death syndrome ("SIDS"), and when he was approximately five years old, his sister—who was five or six weeks old—suffered major developmental brain damage. Bernice McCoy, Garrett's mother, lived with Tim Fultz, who was Garrett's only father figure, for a time. After they separated, Garrett and his mother were homeless for about a year.

{¶ 25} Dr. Reardon testified that Garrett's lack of trust and sense of betrayal continued to develop while he dated Nicole. Nicole had told Garrett that she was unable to get pregnant, but then she got pregnant. Garrett felt isolated and did not even tell his mother about C.D. until C.D.'s third birthday. A "back and forth struggle" ensued between Nicole and Garrett about his "being able to see his daughter," "being able to be a part of his daughter's life," and "being able to be the father that he never had." Moreover, according to Garrett, Nicole would not allow Garrett to see C.D. unless he would have sex with Nicole. So, Garrett would not see his daughter for long periods of time.

{¶ 26} On November 13, 2018, Dr. Reardon provided defense counsel with a comprehensive report. Dr. Reardon diagnosed Garrett with having reactive attachment disorder, persistent, and unspecified bipolar and related disorder. Bipolar disorders are "disorders where there is a dysregulation of energy, of thought, of emotion" and "tend to be very high energy." As further explained by Dr. Reardon, a person with bipolar disorder "may have episodes of major depression." Dr. Reardon also diagnosed Garrett as having schizoid personality disorder with acute dissociative episode. According to Dr. Reardon, as a result of all the experiences in life, a person with schizoid personality disorder copes by "kind of stay[ing] separate from people, stay[ing] apart from them, [does not] connect, * * * live[s] * * * life with people but apart from people." Dr. Reardon stated that Garrett's psychological conditions were "a consequence of some of the severe neglect and abuse that he was subjected to during his infancy, childhood, and adolescence."

{¶ 27} As for Nicole's murder, Dr. Reardon reported that "[a]lthough [Garrett's] state of min[d] was clearly severely deranged at the time of his assault against Nicole Duckson, it appears that from a legal point of view he probably was aware that what he was doing was against the law. At that point, he was simply 'over the edge' and unable to control his actions." At trial, Dr. Reardon stated that Garrett had "recount[ed] some of the events in the moments right before the acts." Garrett received a notification that the child-support agency was going to take away his driver's license, and he concluded that killing Nicole was "a better alternative than losing his driver's license and losing his livelihood." But Dr. Reardon ultimately concluded that Garrett "was sane."

{¶ 28} As for C.D.'s murder, Dr. Reardon reached a different conclusion, stating:

> It is my opinion to reasonable psychological certainty, however, that at the time of his assault and homicide of his daughter [C.D.], * * * Garrett was in an acute dissociative episode. As a result of this, there was a severe disruption of the normal integration of consciousness, memory, emotion, and behavior. In this severely impaired emotional state, he was unable to appreciate the wrongfulness of his acts because he was in the dissociative reaction. The best evidence supporting this is not only a virtually complete inability to actually recall or describe any of his actions but the very furiosity [sic] of the assault itself on his own child who he, by all accounts and all reports, loved.

{¶ 29} Dr. Reardon testified that "the more [he] went into this with [Garrett] and challenged him, the less [Garrett] could tell [Dr. Reardon] about anything that had to do with [C.D.]" Dr. Reardon believed that "the reason for

that was because he was in a dissociative state," meaning that Garrett had experienced a "complete disruption of consciousness, memory, emotion, perception, [and] awareness of experience."

{¶ 30} On December 17, 2018, Dr. Reardon sent a final report to the trial court stating that Garrett was insane when he killed C.D.:

> Pursuant to [R.C.] 2945.371(G)(4) of the Ohio Revised Code, it is my opinion to reasonable psychological certainty that at the time of the alleged offenses in * * * Count Two and Count Three, regarding the homicide of [C.D.] that [Garrett] * * * did have a severe mental disease (Reactive Attachment Disorder, Persistent; Unspecified Bipolar and Related Disorder; Schizoid Personality Disorder with Acute Dissociative Episode). It is my opinion that he did not have a mental defect manifested at that time. It is also my opinion to reasonable psychological certainty that at the time of these alleged offenses, [Garrett] was in a dissociated state. The dissociated state constituted an alteration and impairment in the normal integration of consciousness, memory, perception, and behavior. Dissociative symptoms/episodes are disruptive of every area of psychological functioning. As a result of this dissociated state at the time of these offenses, [Garrett] was not able to appreciate the wrongfulness of the acts charged.

{¶ 31} During Dr. Reardon's cross-examination, he could not say exactly when Garrett came out of the dissociative state once he had murdered C.D. But Garrett knew what he had done was wrong when he fled the scene and hid his clothing and the knife. When Dr. Reardon asked Garrett, "Why [C.D.]?" Garrett

replied, "I refuse to let anyone else raise my child. I didn't want my daughter to grow up without a dad like I had to. I couldn't do that to her."

*2. Dr. Martell's rebuttal*

{¶ 32} Dr. Daniel Martell, the state's forensic psychologist, disagreed with Dr. Reardon's diagnosis because it was based on (1) Garrett's self-report that he could not recall killing C.D. and (2) the severity of Garrett's attack on her. As to the first basis, Dr. Martell stated that "regardless of what [Garrett] told Dr. Reardon; * * * Garrett clearly *was* able to recall what happened at the time he made the decision to kill [C.D.]" (Boldface sic.) Dr. Martell added that Garrett's police statement showed that "he knew what he had done to Nicole * * * was wrong and that [C.D.] was a witness to that, subsequently driving his decision to kill [C.D] as well." As to the second basis, Dr. Martell stated that "there can be many reasons for the degree of force used that do not involve dissociation, and there is nothing specifically diagnostic of dissociation about the use of force."

{¶ 33} Dr. Martell stated that "there are a number of behaviors before, during, and after the killings that reflect upon * * * Garrett's knowledge of [sic] wrongfulness regarding the killings," including (1) Garrett debating whether to go through with it right up to the moment of the attack, (2) Garrett deciding to kill C.D. because she saw him kill her mother, which shows reflection and judgment about what was happening in the moment, (3) Garrett's decision to flee the crime scene with the murder weapon, (4) Garrett's hiding the knife and bloody clothes, and (5) Garrett's decisions to deny any knowledge of the murders and to lie to the police that he cut his hand with a steak knife while trying to open a package during the first interview.

{¶ 34} During cross-examination, Dr. Martell acknowledged that he had not interviewed Garrett. Dr. Martell agreed that testing indicated that Garrett was not malingering or faking a mental illness.

## II. PROCEDURAL HISTORY

{¶ 35} Garrett was charged with four counts. In Count One, Garrett was charged with the aggravated murder of Nicole with prior calculation and design in violation of R.C. 2903.01. This count included a course-of-conduct death-penalty specification for committing multiple murders in violation of R.C. 2929.04(A)(5). In Count Two, Garrett was charged with the aggravated murder of C.D. with prior calculation and design in violation of R.C. 2903.01. In Count Three, he was charged with committing the aggravated murder of a child under the age of 13 in violation of R.C. 2903.01. Count Two and Count Three included three death-penalty specifications: (1) a course-of-conduct specification for committing multiple murders in violation of R.C. 2929.04(A)(5), (2) a specification for purposely causing the death of a child under the age of 13 in violation of R.C. 2929.04(A)(9), and (3) a specification for committing the offense of aggravated murder to escape detection, apprehension, trial, or punishment in violation of R.C. 2929.04(A)(3). In Count Four, Garrett was charged with tampering with evidence in violation of R.C. 2921.12—i.e., concealing the knife and bloody clothing.

{¶ 36} Garrett pleaded NGRI as to Counts Two and Three. He pleaded not guilty to the remaining charges. A jury found Garrett guilty as to all counts and specifications.

{¶ 37} The jury recommended a death sentence as to Counts Two and Three and life in prison without the possibility of parole as to Count One. The trial court merged Counts Two and Three for sentencing purposes and the state elected to proceed to sentencing on Count Three. The trial court imposed a sentence of life in prison as to Count One and a sentence of death as to Count Three. The trial court ordered the sentences for Counts One and Three to be served consecutively. However, it is unclear whether the trial court actually intended for Garrett to be eligible for parole for Count One. During Garrett's sentencing hearing, the trial court stated that Garrett was sentenced to "life

imprisonment without parole." Likewise, in its September 14, 2019 judgment entry, the trial court stated that it was sentencing Garrett to life in prison without eligibility for parole. However, in its September 16, 2019 entry, the trial court stated: "As to Count 1, the Court hereby imposes the sentence of life imprisonment with parole eligibility."

{¶ 38} It is also unclear what prison term the trial court intended to sentence Garrett to for Count Four. At Garrett's sentencing hearing, the trial court imposed a 36-month prison term for Count Four and ordered Garrett to serve that sentence concurrently with the sentences imposed in Counts One and Three. The trial court's September 16, 2019 judgment entry imposes that same sentence for Count Four. But in its September 14, 2019 judgment entry, the trial court stated that it was sentencing Garrett to 12 months in prison for Count Four.

{¶ 39} Garrett appeals his convictions and sentence and raises 16 propositions of law. These issues will be addressed in the approximate order that they arose during the proceedings.

### III. ISSUES RAISED ON APPEAL

### A. Courtroom closure

{¶ 40} In proposition of law No. III, Garrett argues that the trial court violated his right to a public trial by closing the trial to all minors without considering reasonable alternatives or making findings to support the closure. He claims that the closure constituted structural error, requiring a new trial.

*1. Relevant facts*

{¶ 41} At the beginning of trial, the trial court issued a courtroom-decorum order that "children are not permitted to be in attendance throughout this hearing * * * given the nature of the allegations and the offense that * * * Garrett is indicted with." The trial court stated that its order would "remain in effect throughout the entirety of the trial and throughout the entirety of the

proceedings." The trial court defined a child as "anyone under the age of 18, a minor child," adding that "if it's an issue, [it would] reconsider."

{¶ 42} The prosecutor interjected, stating that "whenever anyone is barred from the courtroom, * * * under certain decisions the Court has to give notice in the hearing and those kind of things before folks are excluded from the courtroom." The prosecutor added that he was "concerned that the Court [should] give the notice and allow objections * * * because of the claimed First Amendment right to attend and the high [sic] constitution provision that says all courtrooms shall be open to the public." The trial court responded that "the courtroom [was] open to the public, just not to minor children."

{¶ 43} At the time of its ruling, the trial court noted that a minor was present in the courtroom and stated that it would "need someone to * * * take the young man out into the hallway." Nothing in the record indicates that any other minors had entered the courtroom during the trial and were asked to leave.

{¶ 44} The trial court asked defense counsel, "[A]nything regarding the decorum order?" Defense counsel replied, "No, thank you, Your Honor."

### 2. Legal framework

{¶ 45} The right to a public trial is a fundamental constitutional guarantee under the Sixth Amendment to the United States Constitution and Article I, Section 10, of the Ohio Constitution. *See State v. Lane*, 60 Ohio St.2d 112, 119, 397 N.E.2d 1338 (1979). This guarantee is a "cornerstone of our democracy which should not be circumvented unless there are extreme overriding circumstances." *Id*.

{¶ 46} The right to a public trial is not absolute, and in some instances the right must yield to other interests, such as those that are essential to the administration of justice. A trial judge has authority and discretion to control the courtroom proceedings. Nonetheless, a defendant's right to a public trial may be abridged only when necessary, and any closure must be narrowly drawn and

applied sparingly. *See State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 51.

**{¶ 47}** The violation of the right to a public trial is considered structural error and not subject to harmless-error analysis. *Waller v. Georgia*, 467 U.S. 39, 49-50, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), fn. 9; *Johnson v. United States*, 520 U.S. 461, 468-469, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). A structural error is a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). A public-trial violation constitutes structural error "because of the 'difficulty of assessing the effect of the error,' " *Weaver v. Massachusetts*, ___ U.S. ___, ___, 137 S.Ct. 1899, 1910, 198 L.Ed.2d 420 (2017), quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 149, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006), fn. 4, and because it "furthers interests other than protecting the defendant against unjust conviction," *id*.

*3. Waiver*

**{¶ 48}** Garrett failed to object to the exclusion of minors from the courtroom. But Garrett argues that the error was not waived by his failure to object because the closure constituted structural error. In support of his argument, Garrett cites *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 81, which held that the right to a public trial cannot be waived by a defendant's silence.

**{¶ 49}** But in *Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, at ¶ 59, we held in regard to a partial closure of a trial that "counsel's failure to object to the closing of the courtroom constitutes a waiver of the right to a public trial." *See State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 70 (same). And recently, we reiterated that "the plain-error rule * * * applies to errors that were never objected to at trial, even if those errors can be classified as structural." *State v. McAlpin*, __Ohio St.3d__, 2022-

Ohio-1567, __N.E.3d__, ¶ 66; *see also State v. West*, ___ Ohio St.3d ___, 2022-Ohio-1556, ___ N.E.3d__, ¶ 28 ("assertions of structural error do not preclude an appellate court from applying the plain-error standard when the accused has failed to object"). Thus, *Bethel* does not apply. We conclude that Garrett's failure to make a contemporaneous objection to the trial court's decorum order excluding all minors under the age of 18 from the courtroom forfeited all but plain error.

*4.* Waller *analysis*

{¶ 50} In *Waller*, the United States Supreme Court set out a four-pronged test for determining whether closure of the courtroom is necessary: (1) "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced," (2) "the closure must not be broader than necessary to protect that interest," (3) "the trial court must consider reasonable alternatives to closing the proceeding," and (4) "it must make findings adequate to support the closure." *Id.*, 467 U.S. at 48, 104 S.Ct. 2210, 81 L.Ed.2d 31.

{¶ 51} In *Drummond*, we held that "when a trial judge orders a partial, as opposed to a total, closure of a court proceeding, a 'substantial reason' rather than *Waller*'s 'overriding interest' will justify the closure." *Drummond* at ¶ 53; *see also United States v. Simmons*, 797 F.3d 409, 414 (6th Cir.2015); *Woods v. Kuhlmann*, 977 F.2d 74, 76 (2d Cir.1992); *United States v. Sherlock*, 962 F.2d 1349, 1357 (9th Cir.1989); *Nieto v. Sullivan*, 879 F.2d 743, 753 (10th Cir.1989). Here, we apply the *Drummond* standard because the trial court's order excluding minors from the courtroom was only a partial closure.

***a. Whether there was a substantial reason for partial closure of the courtroom***

{¶ 52} As to the first factor, concerns about evidence that would be inappropriate for minors to hear or see arguably constitutes a substantial reason for excluding minors from the courtroom. *See State v. Hensley*, 75 Ohio St. 255, 264, 79 N.E. 462 (1906), quoting Cooley, *A Treatise on the Constitutional Limitation Which Rest upon the Legislative Power of the States of the American*

*Union*, 379 (6th Ed.1890) (" 'a regard to public morals and public decency would require that at least the young be excluded from hearing and witnessing the evidences of human depravity' "). *See also State v. Schmit*, 273 Minn. 78, 139 N.W.2d 800, 806 (1966); *Marshall v. State*, 254 Ind. 156, 159, 258 N.E.2d 628 (1970).

{¶ 53} Garrett argues that neither party requested the closure to minors and that there were no security concerns associated with the trial court's ruling. But those points do not rebut the trial court's substantial interest in protecting minors from the nature of the offense or the type of evidence that was going to be elicited.

### b. Whether closure was no broader than necessary to protect the public from age-inappropriate evidence

{¶ 54} "Modern cases applying *Waller* [467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31] * * * have held that exclusions of all minors from large portions of a trial are broader than necessary to advance the legitimate interest in protecting young children from exposure to age-inappropriate evidence." 6 LaFave, Israel, King, & Kerr, *Criminal Procedure*, Section 24.1(b), (4th Ed.2021); *see also In re G.B.*, 2018 COA 77, 433 P.3d 138, ¶ 37 (closing a courtroom to all spectators under the age of 18 was broader than necessary to protect young children from age-inappropriate evidence). *Reynolds v. State*, 41 Ala.App. 202, 126 So.2d 497 (1961), is illustrative. In that case, the court held that a trial court's order excluding all people aged 18 years or less violated the defendant's right to a public trial, explaining: "Persons of eighteen years of age can hardly be deemed children of 'tender age.' Males of that age are subject to military service. In some states persons of that age can vote." *Id*. at 204*; see also In re G.B.* at ¶ 39. Moreover, the closure order was not limited in scope or duration but continued for the entire trial.

{¶ 55} The state argues that the closure order was narrowly tailored because it applied only to children, its enforcement resulted in the exclusion of one child, and the trial court agreed to revisit the order if asked. But the order was broader than necessary to protect minors from age-inappropriate evidence; it made no distinction between children of different ages and excluded all minors, not just young children, from the courtroom. And neither the trial court's agreement to revisit the order upon request nor the number of children who had actually been excluded from the courtroom are relevant to whether the order was narrowly tailored in the first instance.

{¶ 56} We conclude that closing the courtroom to *all* minors was broader than necessary to protect children from age-inappropriate evidence.

### c. Whether the trial court considered reasonable alternatives before partially closing the courtroom

{¶ 57} With respect to the third factor, the record does not show that the trial court considered reasonable alternatives. The state argues that the trial court was not required to consider such alternatives without a defense request. But *Waller*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31, requires that trial courts consider reasonable alternatives "even when they are not offered by the parties." *Presley v. Georgia*, 558 U.S. 209, 214, 130 S.Ct. 721, 175 L.Ed.2d 675 (2010). This is so because "[t]rial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials." *Id*. at 215.

{¶ 58} Because the trial court did not expressly consider any lesser alternatives, the court failed to meet the third *Waller* requirement.

### d. Whether the trial court made findings adequate to support its decision to partially close the courtroom

{¶ 59} As to the final *Waller* factor, the trial court failed to make adequate findings on the record to support its ruling. The state argues that the trial court made findings when it explained that the order was based on "the nature of the

allegations." But *Waller* states that a court "must make findings adequate to support the closure." *Id.* at 48. Here, the trial court's conclusory rationale for closing the court to minors was not adequate. *See State v. Woods*, 8th Dist. Cuyahoga Nos. 94141 and 94142, 2011-Ohio-817, ¶ 26 (trial court's failure to fully question witness about his fear in testifying and make findings on the record to support closure did not satisfy *Waller*'s fourth factor).

### 5. Triviality standard

{¶ 60} The state argues that because nothing in the record shows that more than one child was denied entrance to the courtroom, the closure was "trivial." *See United States v. Perry*, 479 F.3d 885, 890 (D.C.Cir.2007). In *Perry*, the trial court excluded a defendant's eight-year-old son from the courtroom, reasoning that the only motive for having him there was to evoke sympathy. *Id*. at 887-888. On appeal, the circuit court concluded that even a problematic courtroom closure may be too trivial to amount to a violation of the Sixth Amendment; a closure is "trivial" when it does not implicate the values served by the Sixth Amendment. *Id*. at 890. The court added that the defendant's son's presence would not ensure that the judge and the prosecutor carried out their duties responsibly, discourage perjury, or encourage any witnesses to come forward. *Id*. at 890-891.

{¶ 61} We have never adopted the triviality standard for evaluating courtroom closures. But even if we were to apply the triviality standard, the closure here would still fail because the trial court ordered the *categorical* exclusion of all minors under the age of 18. And "the 'trivial' standard * * * relies in most cases on an inadvertent act, which is not the situation here." *State v. Lormor*, 172 Wash.2d 85, 96, 257 P.3d 624 (2011). Thus, we reject the state's argument.

### 6. No plain error occurred

{¶ 62} As explained above, the trial court failed to satisfy at least three prongs of the test as stated in *Waller*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31,

and therefore erred in closing the courtroom to all minors. But even so, Garrett does not prevail because he has not established plain error.

{¶ 63} "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). "By its very terms, [Crim.R. 52(B)] places three limitations on a reviewing court's decision to correct an error" that was not raised in the trial court. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). First, an error, "i.e., a deviation from a legal rule," must have occurred. *Id*. Second, the error complained of must be plain—that is, it must be "an 'obvious' defect in the trial proceedings." *Id*. "Third, the error must have affected 'substantial rights.' We have interpreted this * * * to mean that the trial court's error must have affected the outcome of the trial." *Id*.

{¶ 64} Garrett does not argue that the ultimate outcome of the proceedings (i.e., the findings of guilt and the death sentence) would have been different if the trial court had not closed the courtroom to minors or had engaged in the proper analysis before doing so. *See State v. Tabor*, 4th Dist. Jackson No. 16CA9, 2017-Ohio-8656, ¶ 27. Thus, he has failed to establish plain error.

{¶ 65} Based on the foregoing, we reject proposition of law No. III.

**B. *Batson* challenges**

{¶ 66} In proposition of law No. V, Garrett argues that the state's peremptory challenges against prospective jurors 12 and 32, a biracial male and an African-American male, violated his equal-protection rights under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

*1*. Batson v. Kentucky

{¶ 67} A defendant has "the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." *Id*. at 85-86. Accordingly, a constitutional violation occurs when the prosecution challenges "potential jurors solely on account of their race or on the assumption that black jurors as a group

will be unable impartially to consider the State's case against a black defendant." *Id*. at 89. "The Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Flowers v. Mississippi*, ___ U.S. ___, ___, 139 S.Ct. 2228, 2244, 204 L.Ed.2d 638 (2019).

{¶ 68} In *Batson,* the United States Supreme Court established a three-factor test for adjudicating race-based challenges. *Id*. at 96. "First, the opponent of the peremptory challenge must make a prima facie case of racial discrimination." *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 106. If the opponent satisfies that burden, "the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Batson* at 97. "At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation." *Hernandez v. New York*, 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). Although it is not enough to simply deny a discriminatory motive or assert good faith, *Batson* at 98, the "explanation need not rise to the level justifying exercise of a challenge for cause," *id.* at 97.

{¶ 69} Finally, "the trial court must decide based on all the circumstances, whether the opponent has proved purposeful racial discrimination." *Bryan* at ¶ 106; *see also Batson*, 476 U.S. at 98, 106 S.Ct. 1712, 90 L.Ed.2d 69. "The trial judge must determine whether the prosecutor's stated reasons were the actual reasons or instead were a pretext for discrimination." *Flowers* at ___, 139 S.Ct. at 2241. The court must "assess the plausibility of" the prosecutor's reason for striking the juror "in light of all evidence with a bearing on it." *Miller-El v. Dretke*, 545 U.S. 231, 252, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) ("*Miller-El II*"). Relevant factors may include "the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Miller-El v. Cockrell*, 537 U.S. 322, 339, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) ("*Miller-El I*"). "In addition, race-neutral reasons for peremptory challenges often invoke a

juror's demeanor (e.g., nervousness, inattention), making the trial court's firsthand observations of even greater importance." *Snyder v. Louisiana*, 552 U.S. 472, 477, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008).

{¶ 70} The trial court's finding at step three "is entitled to deference, since it turns largely 'on evaluation of credibility.' " *State v. White*, 85 Ohio St.3d 433, 437, 709 N.E.2d 140 (1999), quoting *Batson*, 476 U.S. at 98, 106 S.Ct. 1712, 90 L.Ed.2d 69, fn. 21. Accordingly, "[a] trial court's findings of no discriminatory intent will not be reversed on appeal unless clearly erroneous." *Bryan* at ¶ 106; *see also Miller-El I* at 340. If, however, a trial court does err in applying *Batson,* the error is structural. *See United States v. McFerron*, 163 F.3d 952, 955-956 (6th Cir.1998) (cataloging federal appellate courts that have unanimously and "resoundingly" rejected arguments that *Batson* errors are subject to harmless-error review).

### 2. Prospective juror No. 12

#### a. Relevant facts

{¶ 71} The juror questionnaire asked the jurors, "Have you, or any member of your family, or close friend ever been a victim of a crime?" Prospective juror No. 12 checked "yes" and wrote, "He was killed." Jurors were also asked, "What are your general feelings about law enforcement?" Prospective juror No. 12 wrote: "Not a fan." Another question asked: "Do you believe that police do/do not (circle one) carefully investigate criminal cases? Please explain why you feel this way." Prospective juror No. 12 circled "do not" and wrote: "I believe there are crooked cops out there." Prospective juror No. 12 was not asked about these subjects during individual or general voir dire.

{¶ 72} The state peremptorily challenged prospective juror No. 12 and defense counsel made a *Batson* challenge. The prosecuting attorney provided the following reasons for the peremptory challenge:

His questionnaire indicated he had a family member who was killed. *He didn't volunteer that when other jurors did that at the same time.* He—In his questionnaire also when asked about his feelings about law enforcement, he said he's not a fan, quote, unquote.

And he had another comment about do you believe that police do not—He circled do not carefully investigate a criminal case. Explain your reasons why. He says he believes the reason was there's crooked cops out there.

So considering all those things, Your Honor, the State felt that it was appropriate to use a peremptory in light of those statements on his questionnaire.

(Emphasis added.) When asked if he had a response, defense counsel stated, "No, Your Honor, just making the record." The trial court overruled the *Batson* challenge, finding that there was "no discriminatory intent to strike [prospective juror No. 12] and that the State of Ohio has given race-neutral reasons for excluding [prospective juror No. 12]."

### b. Analysis

{¶ 73} Garrett asserts that the prosecutor's second reason for striking prospective juror No. 12 (negative views of law enforcement) was pretextual, because prospective juror No. 12 stated on his questionnaire that he did not believe that criminals were treated too leniently. Garrett also argues that the prosecutor's race-neutral explanation was "specious" because this is not a case in which law-enforcement testimony was challenged.

{¶ 74} Comparing prospective juror No. 12's voir dire answers to the answers given by individuals who served on Garrett's jury is a crucial step in analyzing this claim. In *Miller-El II*, the Supreme Court held: "If a prosecutor's

proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Id.*, 545 U.S. at 241, 125 S.Ct. 2317, 162 L.Ed.2d 196. Seated juror No. 2 believed that "generally good people" serve in law enforcement, but that "the unions protect many bad ones." Seated juror No. 41's feelings about law enforcement were "[n]egative as of the past few years" and believed that there was some corruption with criminal investigations.

{¶ 75} Arguably, prospective juror No. 12's answers were not that dissimilar from the answers of two seated jurors. But unlike any of the seated jurors, prospective juror No. 12 answered on the questionnaire that he did not believe that the police carefully investigate criminal cases. Thus, the record does not support Garrett's claim that the prosecutor's second race-neutral explanation for striking prospective juror No. 12 was pretextual. *See State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 94-95. Prospective juror No. 12's peremptory challenge was not a *Batson* violation.

### 3. Prospective juror No. 32

#### a. Relevant facts

{¶ 76} The juror questionnaire revealed that prospective juror No. 32 had a previous conviction for robbery. Prospective juror No. 32 also had a brother who had been in a federal penitentiary in Florida. The prosecutor did not ask prospective juror No. 32 about either of these subjects during voir dire.

{¶ 77} During individual voir dire, prospective juror No. 32 assured the prosecutor that he would be fair and open minded in considering the evidence and "would listen to everything." He said that he "wouldn't be against death if it amounted to that."

{¶ 78} During general voir dire, the assistant prosecutor inquired whether any of the prospective jurors would be unable to follow the instruction that "one

witness if believed by you, is sufficient to prove any fact." She then asked: "Is there anyone here who says, nope, can't follow that instruction, I need at least two witnesses?" Prospective juror No. 32 raised his hand.

{¶ 79} The assistant prosecutor and prospective juror No. 32 then engaged in a lengthy colloquy involving a hypothetical concerning whether a pilot who testified that he flew the Goodyear Blimp over an Ohio stadium would be all that would be necessary to prove the fact that that pilot indeed flew the Goodyear Blimp over an Ohio stadium. Prospective juror No. 32 expressed concerns about accepting only the hypothetical pilot's testimony, stating that he would want "a little more proof." He explained that "just because [someone] say[s] [he] did it doesn't make it so." Prospective juror No. 32 also expressed other concerns about the hypothetical pilot's testimony, questioning how convincing the pilot's testimony would be and whether there would have been other evidence to corroborate his account.

{¶ 80} The assistant prosecutor then abandoned the hypothetical, continuing the conversation with prospective juror No. 32 as follows:

[ASSISTANT PROSECUTOR]: So, [prospective juror No. 32], there will be people that come into this courtroom and they will be talking about, you know, things that they saw, things that they heard, things that they did as police officers in the investigation. Some of that is going to be recorded and you'll get to see it, but a lot of it isn't. And so what we're trying to do is make sure that there might be some things that an officer comes in here and says and he's the only single person that says that. What I want to do is make sure that you can follow that instruction one witness, if believed by you—

PROSPECTIVE JUROR NO. 32: Right.

[ASSISTANT PROSECUTOR]: —And you're not looking for, you know, like a video of him doing that.

PROSPECTIVE JUROR NO. 32: But I'm saying the difference between an officer—An officer is at a crime scene, so he's seen something, he's been there. He's not just saying I drove by the crime scene and that happened. You know because I'm saying I've seen crime scenes before where officers stay there all night if they have to. So, you know, what I'm saying is that if something is going on and an officer is there, he doesn't have no reason to lie if he sat there.

* * *

[ASSISTANT PROSECUTOR]: We would be talking about, you know, things the officer did in the investigation, going to a place to find evidence, a witness coming upon a scene and what that witness saw, heard at that scene and there might not be anyone else who can corroborate that. What do you. think about that?

PROSPECTIVE JUROR NO. 32: It all depends on how convincing they are.

(Capitalization sic.) The trial court then discussed the one-witness rule and questioned prospective juror No. 32 as follows:

THE COURT: Ladies and gentlemen, you know, you're going to get an instruction at the end of the trial that one witness, if believed by you, is sufficient to prove any fact. Now, there's a big qualifier in there, if believed by you. If you don't believe the witness, you don't have to accept their conclusions as proof of

anything; but if you believe that witness beyond a reasonable doubt, the instruction is that you can accept that as a proven fact.

Can you do that, [prospective juror No. 32]?

PROSPECTIVE JUROR NO. 32: Yeah, I could.

THE COURT: Okay. If you believed that witness, you believe what they're saying, you believe everything they're testifying about, you can—You can follow that instruction?

PROSPECTIVE JUROR NO. 32: Right.

(Capitalization sic.)

**{¶ 81}** The prosecutor peremptorily challenged prospective juror No. 32, and defense counsel objected based on *Batson*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. The prosecutor offered three reasons for challenging prospective juror No. 32: (1) he had a prior robbery conviction, (2) the juror's brother either was or had been in a federal prison, and (3) the juror's statements called into question whether he could follow the one-witness instruction. The prosecutor concluded: "So I think *considering all those matters he would be an appropriate exercise* of a peremptory not related to his race." (Emphasis added.)

**{¶ 82}** When the trial court asked defense counsel whether he had any response to the prosecutor's explanation, defense counsel responded, "No, no, just appreciate the record."

**{¶ 83}** The trial court then made the following findings:

[T]he State has provided several race-neutral reasons for excusing the juror. The Court finds that they're not pre-textual. Quite frankly, some of [prospective juror No. 32's] responses, both two weeks ago and today, are a little bit—He has a different thought process. I think he marches to a different drummer. And that's

26

based on my observations of him two weeks ago and today. Very nice man, but I did have some concerns about his response to the one witness instruction. So I do find that the State's challenge to [prospective juror No. 32] is good and will overrule the *Batson* challenge as to him.

### b. Analysis

{¶ 84} As for the state's first reason for using a peremptory challenge to excuse prospective juror No. 32 (the prior robbery conviction), the prosecutor stated that prospective juror No. 32 had a robbery conviction. But prospective juror No. 32's questionnaire did not identify whether he was the principal offender in committing the offense, and other than the fact that the questionnaire stated that there was "no gun," there were no additional details about the crime. Regardless of whether prospective juror No. 32 was the principal offender, courts have "recognized that the potential bias that may result from a prospective juror's or his or her family's experiences with the criminal justice system may be a legitimate, racially-neutral reason for exercising a peremptory challenge against the prospective juror." *State v. May*, 2015-Ohio-4275, 49 N.E.3d 736, ¶ 51 (8th Dist.); *see also State v. King*, 1st Dist. Hamilton No. C-060335, 2007-Ohio-4879, ¶ 30.

{¶ 85} The same holds true for the state's second reason, that prospective juror No. 32's brother was (or had been) in a federal prison. Garrett claims that the state never asked prospective juror No. 32 about his brother's incarceration. But this is not a situation in which the prosecutor's failure to question a prospective juror about his imprisoned family member indicates that his reason for striking prospective juror No. 32 was a sham, because none of the seated jurors indicated that they had had family members in prison. Thus, the

prosecutor's second reason was a valid race-neutral reason for peremptorily challenging prospective juror No. 32.

{¶ 86} As for the prosecutor's third reason (prospective juror No. 32's responses pertaining to the one-witness instruction), the state argues in its merit brief that prospective juror No. 32's answers provided ample reasons to question whether he could be a fair juror. Garrett argues that prospective juror No. 32 assured the trial court that he could follow the law, including the one-witness instruction.

{¶ 87} The trial court expressed concern about prospective juror No. 32's answers to the one-witness instruction. The trial court also said that prospective juror No. 32 appeared to have a "different thought process" and that he seemed to "march[] to a different drummer." The trial court's firsthand observations are entitled to deference. As the United States Supreme Court has stated, "[i]n this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Snyder*, 552 U.S. at 477, 128 S.Ct. 1203, 170 L.Ed.2d 175. Thus, the prosecutor's third reason was also a valid race-neutral reason for the strike.

{¶ 88} Based on the foregoing, we reject proposition of law No. V.

### C. Voluntariness of police statements

{¶ 89} In proposition of law No. VI, Garrett argues that the trial court erred in denying his motion to suppress his police statements on January 5 and 7 because they were not voluntary.

*1. Relevant facts*

{¶ 90} Before trial, Garrett moved to suppress the statements that he gave to police on January 5 and January 7, 2018. Garrett argued that his January 5 statement was involuntary because police threatened him with the death penalty and promised leniency if he cooperated. Garrett argued that his January 7

statement had been tainted by the first interview and thus was also inadmissible. The parties stipulated to the evidence in the record, and no witnesses testified during the hearing on Garrett's motion.

{¶ 91} The trial court denied the motion to suppress, finding that the police officers' statements about the death penalty and their offers of leniency did not render Garrett's January 5 and 7 statements involuntary. The trial court also ruled that even if the January 5 statement was involuntary, any possible taint did not extend to Garrett's January 7 statement.

### a. January 5 interview

{¶ 92} On January 5, Detective Porter and Sergeant Sicilian interviewed Garrett at the Columbus Police Department. Before the interview started, Garrett stated that he was a high school graduate, had no hearing or vision problems, and had not used drugs or alcohol during the last 12 to 24 hours. Garrett told police that he had cut his hand on a steak knife and that he had stitched the injury himself.

{¶ 93} After Garrett waived his *Miranda* rights, Detective Porter told Garrett that Nicole and C.D. had been stabbed and that he believed that Garrett's blood and DNA would be found at the scene. Garrett denied killing them and said that no evidence linking him to the murders would be found. Detective Porter stated: "If * * * we can talk like men and you can give me a reason, even if it seems [like] it paints you in a bad light for a while * * * it is going to look better."

{¶ 94} As the interview continued, Garrett asked, "What ends up happening to a lot of people that ends up in my position right now * * * after it is all said and done?" Detective Porter replied that "a lot of this" depended on Garrett and whether he was cooperative and showed genuine remorse. Garrett then asked Detective Porter whether Detective Porter was referring to "a plea deal or something like that." Detective Porter responded, "That's not up to me." Detective Porter added: "I will go to bat for you. I am not lying about that. It's

not a line.  I am telling you the truth.  * * * I will speak on your behalf in this situation if you are truthful with me."

{¶ 95} Following a period in which Garrett had little to say, Sergeant Sicilian said: "The other major thing here if you don't explain why this thing happened today * * * in about 10 years, 15 years, they are going to put a needle in your arm.  That's how bad this is if you don't explain it.  I would not lie to you, okay?  That is how serious it is."  Sergeant Sicilian then said, "We talk to prosecutors.  It's not a death penalty case.  He lost it.  A fit of rage.  He was in a corner.  The man's human.  It's just how he responded to stress."  Sergeant Sicilian also said, "If we don't have an explanation * * * that's what you're gonna face."

{¶ 96} After the death penalty had been mentioned, Garrett asked, "If somebody [is] in the position that I am right now being possibly charged with two homicides they wouldn't get the death penalty, would they get like 135 years?"  Sergeant Sicilian replied, "That is up to the prosecutors and not up to us."  He added, "Whatever ends up happening is going to almost certainly depend upon your truthfulness and level of cooperation."  Sergeant Sicilian also said, "I have never heard of anybody coming into this interview room, giving a truthful statement and getting a death penalty.  * * * It does not happen."

{¶ 97} As the interview continued, Sergeant Sicilian mentioned the parole board.  Garrett said that "there [would be] no board" because he was facing two murder charges.  Sergeant Sicilian told Garrett that that was untrue.  And Detective Porter added that "even Charles Manson went up for parole.  * * * And he killed a lot of people.  * * * The law is you go up for parole.  * * * You automatically go up for it.  And they review what kind of inmate you have been."

{¶ 98} About two and one-half hours after the interview started, Garrett asked about receiving medical treatment for his hand and he was told that he would be taken to the hospital before going to jail.  About an hour later, Garrett

asked whether the officers had "something for his hand." Detective Porter said: "We don't until we get you to a medical facility." Detective Porter then asked whether Garrett had finished answering questions. Garrett did not respond, and the interview continued.

{¶ 99} Later in the interview, Detective Porter told Garrett that "this silent treatment you're doing is going to end with a needle in your arm." Garrett was told, "You are going to see the pictures of your daughter and you are going to go to death row." Thereafter, Garrett acknowledged that he went to Nicole's house that morning, that he had cut his hand there, and that it was his blood on the driveway. Garrett then asked to have his hand treated and the interview ended.

### b. January 7 interview

{¶ 100} On January 7, Garrett requested to talk to Detective Porter and Detective Porter reinterviewed Garrett at the hospital. After reaffirming that Garrett waived his *Miranda* rights, Garrett stated that he wanted to provide a full confession. But Garrett told Detective Porter that as a preliminary matter, he wanted his story to be posted and explained on Facebook. Garrett stated that he was "100 percent coherent" and that he had had "a lot of time to think." Neither the death penalty nor other potential penalties had been mentioned. Garrett then confessed to killing Nicole and C.D., disclosed where he hid the knife and the clothes he was wearing when he committed the murders, and explained that he went to a hospital in Dayton to have his injured hand treated.

### 2. Analysis

{¶ 101} If a defendant challenges a confession as involuntary, the state must prove a knowing, intelligent, and voluntary waiver by a preponderance of evidence. *See Colorado v. Connelly*, 479 U.S. 157, 168-169, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Voluntariness of a confession is determined by "the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence

of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus. A waiver will not be deemed to be involuntary "*unless* there is evidence of police coercion, such as physical abuse, threats, or deprivation of food, medical treatment, or sleep." (Emphasis sic.) *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, ¶ 35.

{¶ 102} Other than the fact that Garrett was in police custody, nothing about the circumstances of his interrogation was inherently coercive. At the time of the offense, Garrett was a 24-year-old high-school graduate. Detective Porter testified that the first interview had lasted seven hours, but Garrett was offered water during the January 5 interview and was permitted to use the bathroom. *See State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 108 (that defendant was offered beverages, permitted to smoke, and use the bathroom supported a finding of voluntariness).

{¶ 103} Garrett argues that his January 5 statement was involuntary because the police lied to him about potentially receiving lenient treatment. Detective Porter may have misled Garrett that he would "go to bat" for Garrett if he was truthful about what happened. Sergeant Sicilian assured Garrett that his case was not a death-penalty case. However, "the presence of promises does not as a matter of law, render a confession involuntary." *Edwards* at 41. Officers may discuss the advantages of telling the truth, advise suspects that cooperation will be considered, or even suggest that a court may be lenient with a truthful defendant. *Id*. Garrett was not guaranteed leniency if he cooperated with the police. The investigator's statements were not unduly coercive. *See State v. Western*, 2015-Ohio-627, 29 N.E.3d 245, ¶ 46 (2d Dist.).

{¶ 104} Next, Garrett argues that Detective Porter's and Sergeant Sicilian's threats about the death penalty coerced him into making an involuntary statement. A brief reference to the death penalty does not by itself, render a

subsequent confession involuntary when the statement merely illustrates the seriousness of the crime and the defendant's will was not overborne as a result of the statement. *State v. Ford,* 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 201. Moreover, a constitutional violation occurs only when the confession results *directly* from the threat that capital punishment will be imposed if the suspect is uncooperative and a promise of leniency is made in exchange for the suspect's cooperation. *Id*.; *see also People v. Winbush*, 2 Cal.5th 402, 453, 213 Cal.Rptr.3d 1, 387 P.3d 1187 (2017).

{¶ 105} Detective Porter and Sergeant Sicilian made multiple comments about the death penalty during the interview. They did not misstate the law in telling Garrett that the death penalty was a potential punishment for the murders. Nor did they claim to have any authority to decide how Garrett would be charged. Sergeant Sicilian told Garrett that a decision about seeking the death penalty in the case would be "up to the prosecutors." And when Garrett had inquired into plea deals, Detective Porter explained that any decision to offer a plea deal was not up to him.

{¶ 106} The trial court's findings of fact characterized Garrett's interaction with the police as "cagey," because Garrett was trying to surmise the strength of the evidence against him during the interview. In concluding that Garrett's will was not overborne, the trial court determined that Garrett's silence was "not due to fear or intimidation by police, but was a cunning effort to assess the progress of the investigation." "[A]n appellate court accords great deference to the trial court's findings of fact." *See State v. Robinson*, 9th Dist. Summit No. 16766, 1995 WL 9424, *6 (Jan. 11, 1995). Thus, we find that the investigators' comments about the death penalty did not render Garrett's January 5 statement involuntary.

{¶ 107} Finally, Garrett argues that the refusal of the investigators to obtain medical aid for his injured hand rendered his confession involuntary.

When the interview started on January 5, Garrett told Detective Porter that he had cut his hand with a steak knife while trying to open a package, but he did not mention that he had already received medical treatment, nor did he request additional medical treatment. When Garrett later asked about receiving treatment for his hand, he was told that he would be taken to a hospital after the interview was over. And Garrett continued with the interview after he was asked whether he was finished answering questions. Once Garrett finished answering questions and asked to have his hand treated, the interview ended. Thus, Garrett's confession was not involuntary based on when Detective Porter and Sergeant Sicilian sought medical care for his hand.

{¶ 108} Based on the totality of the circumstances, we conclude that Garrett's January 5 police statements were voluntary.

{¶ 109} Garrett claims that his January 7 statement was inadmissible because it was tainted by his previous involuntary statement. But as explained above, Garrett's January 5 statement was voluntary. And even if it had not been, there was a "break in the stream of events * * * sufficient to insulate" Garrett's January 7 statement from his January 5 interrogation. *Clewis v. Texas*, 386 U.S. 707, 710, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967); *see also Oregon v. Elstad*, 470 U.S. 298, 310, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) ("the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession").

{¶ 110} Garrett also claims that he was in pain and was not free to leave the hospital when he made his second statement. But it was Garrett who requested the second interview. And at the beginning of the January 7 interview, Garrett told Detective Porter that he was 100 percent coherent and that he had plenty of time to think. And nothing further was mentioned about the death penalty or other potential penalties during that interview. Thus, under the totality

of the circumstances, we conclude that Garrett's January 7 statement was voluntary.

{¶ 111} Based on the foregoing, we reject proposition of law No. VI.

### D. Gruesome photographs

{¶ 112} In proposition of law No. IV, Garrett argues that the trial court erred in admitting gruesome crime-scene and autopsy photographs. However, defense counsel did not object to this evidence at trial, so Garrett must prove plain error. *See State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 132.

{¶ 113} We have "strongly caution[ed] judicious use" of gruesome photographs in capital cases. *State v. Morales*, 32 Ohio St.3d 252, 259, 513 N.E.2d 267 (1987). To be admissible, the probative value of each photograph must not be substantially outweighed by the danger of prejudice to the defendant, Evid.R. 403(A). *See State v. Maurer*, 15 Ohio St.3d 239, 264-266, 473 N.E.2d 768 (1984). And a relevant photograph may be excluded if it is needlessly repetitive or cumulative in nature, Evid.R. 403(B). *Id.* The admission of gruesome photographs is left to the trial court's sound discretion. *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 69.

*1. Crime-scene photos*

{¶ 114} Garrett complains about 17 crime-scene photographs. State's exhibit Nos. E22 and E25 are gruesome close-up photographs of Nicole's and C.D.'s heads and faces as they were found at the crime scene. These photographs were highly relevant to illustrate the testimony of the police officers who processed the crime scene.

{¶ 115} State's exhibit No. E23 shows a wound on Nicole's fingers and state's exhibit No. E26 shows wounds on the palms of C.D.'s left hand. Neither photo is particularly gruesome. Both photos were relevant in showing that Nicole and C.D. tried to defend themselves when they were attacked with a knife. Each

photo was highly "probative of [the defendant's] intent and the manner and circumstances of the victims' deaths," *Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 134, and the probative value of each outweighed the danger of unfair prejudice, *id*. at ¶ 133.

{¶ 116} Garrett also complains about repetitive photos depicting Nicole's and C.D.'s bodies at the crime scene. State's exhibit Nos. E18 through E21 and E24 are gruesome photos that were relevant to show that Nicole and C.D. were violently attacked. Those photographs also show the location of their bodies. But these exhibits are repetitive and only one of the closeups, state's exhibit Nos. E21 or E24, should have been admitted. Nevertheless, because of the overwhelming evidence of guilt, Garrett has failed to show that any such error prejudiced him by affecting the outcome of the trial. No plain error occurred.

{¶ 117} None of the remaining crime-scene photos that Garrett complains about are gruesome, and therefore there was no error in admitting them. *See State v. Froman*, 162 Ohio St.3d 435, 2020-Ohio-4523, 165 N.E.3d 1198, ¶ 105.

{¶ 118} Finally, because the defense did not contest the cause and manner of death of each victim, Garrett argues that multiple crime-scene photos should not have been admitted. In *Ford*, we criticized the use of too many crime-scene and autopsy photographs in murder trials because gruesome photos expose the jurors to horrific images and often serve no useful purpose except to inflame the passions of the jurors. *Ford* states that "[a] few crime-scene photos showing the body along with the coroner's testimony will often suffice." *Id*., 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, at ¶ 257. Not too many crime-scene photos were admitted here, and no plain error occurred.

### 2. Nicole's autopsy photos

{¶ 119} Garrett argues that the trial court erred in admitting five autopsy photographs of Nicole.

{¶ 120} State's exhibit Nos. H2 and H4 depict different views of the stab and incised wounds to Nicole's head after the blood was removed. State's exhibit No. H3 shows a stab wound that punctured Nicole's lung. State's exhibit No. H5 shows a 2.8-centimeter-long incised wound below the chin. And state's exhibit No. H6 shows a 14.5-centimeter-long incised wound behind her right ear. These photographs are gruesome. Yet each of these nonrepetitive photographs illustrate Dr. Daniels's testimony about Nicole's wounds and her cause of death. The probative value of each photograph is not substantially outweighed by any prejudicial impact. No plain error was committed in admitting them.

### 3. C.D.'s autopsy photos

{¶ 121} Garrett also argues that the trial court erred in admitting four autopsy photographs of C.D.

{¶ 122} State's exhibit Nos. J3 and J4 show horrific incised wounds to both sides of C.D.'s face. State's exhibit No. J2 shows incised wounds on the back of C.D.'s head and behind her right ear and a stab wound on the top of her head. And state's exhibit No. J5 depicts an entrance wound that "carried 3/4 of an inch into the left parietal lobe of the brain." Each of these photographs illustrated Dr. Daniels's testimony about C.D.'s wounds and the cause of death. We conclude that the probative value of each photograph is not substantially outweighed by any prejudicial impact.

{¶ 123} Citing *Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, Garrett argues that the mode and manner of death were not contested and that these photographs only served to inflame the passions of the jury. But the few autopsy photographs that were admitted did not result in plain error.

{¶ 124} Based on the foregoing, we reject proposition of law No. IV.

### E. Sufficiency and manifest weight of the evidence

{¶ 125} In proposition of law No. VII, Garrett challenges the sufficiency and manifest weight of the evidence of his convictions for (1) the aggravated

murder of C.D. with prior calculation and design, (2) the aggravated murder of C.D., a child under the age of 13 years, and (3) the death-penalty specifications attached to those charges.

### *1. Sufficiency of the evidence*

{¶ 126} In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶ 127} Garrett argues that his convictions of Counts Two and Three and the attached death-penalty specifications must be reversed, because he established by a preponderance of the evidence that he was NGRI. But sanity is not an element of the offense of aggravated murder; rather, insanity is an affirmative defense, *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, 781 N.E.2d 72, ¶ 64; R.C. 2901.01(A)(14). An affirmative defense has no bearing on the sufficiency of the evidence underlying a conviction. As we held in *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, " 'the due process "sufficient evidence" guarantee does not implicate affirmative defenses, because proof supportive of an affirmative defense cannot detract from proof beyond a reasonable doubt that the accused had committed the requisite elements of the crime.' " *Id*. at ¶ 37, quoting *Caldwell v. Russell*, 181 F.3d 731, 740 (6th Cir.1999).

{¶ 128} Garrett urges us to revisit our decision in *Hancock* and address the sufficiency of the evidence as it relates to insanity. But Garrett sets forth no rationale for overturning *Hancock*. Thus, we reject Garrett's insufficiency claims as to Counts Two and Three and the specifications based on his insanity claim.

{¶ 129} Garrett also quotes *Clark v. Arizona*, 548 U.S. 735, 126 S.Ct. 2709, 165 L.Ed.2d 842 (2006), in support of his argument that his mental health remains relevant in evaluating his mens rea. In *Clark*, the appellant challenged Arizona law that allowed mental-disease and capacity evidence to be considered only for its bearing on an insanity defense and not on the element of mens rea. But the Supreme Court rejected Clark's argument, holding that Arizona's limitation on the consideration of mental-disease or capacity evidence to its bearing on the insanity defense did not violate due process. *Id*. at 778-779. Thus, *Clark* does not require this court to consider Dr. Reardon's testimony as it may have been relevant to Garrett's mens rea.

{¶ 130} Garrett also argues that there is insufficient evidence to prove the element of prior calculation and design to support his convictions for Counts Two and Three.[2]

{¶ 131} Garrett argues that the state's evidence was insufficient to prove that he intended to kill C.D., because there was no evidence that their relationship was strained and he told police that he did not believe that C.D. would be at the house when he confronted Nicole.

{¶ 132} "The phrase 'prior calculation and design' by its own terms suggests advance reasoning to formulate the purpose to kill." *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 18. There is no bright-line test to distinguish between the presence or absence of prior calculation and design; each case depends upon its own facts. *Id.* at ¶ 19. Though they are not dispositive, courts traditionally consider three factors in determining whether prior calculation and design exists: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought

---

2. Although Garrett claims there is insufficient evidence of prior calculation and design to support his convictions for the death-penalty specifications attached to Counts Two and Three, prior calculation and design is not an element of those specifications.

or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events?' " *State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997), quoting *State v. Jenkins*, 48 Ohio App.2d 99, 102, 355 N.E.2d 825 (8th Dist.1976).

{¶ 133} There is sufficient evidence for any rational trier of fact to find that Garrett killed C.D. with prior calculation and design. The jury could conclude that Garrett went to C.D.'s house with the intention of killing her. Evidence established that Garrett was behind on child-custody payments for C.D. and that he had just received notification that the child-support agency was going to take away his driver's license. Garrett took a large knife with him from his home, went to Nicole's house, waited for C.D. and Nicole to walk outside, and then walked up the driveway and repeatedly stabbed them.

{¶ 134} Alternatively, the jury could conclude that even if Garrett did not go to the house with the intent to kill C.D., he formed the intent to kill C.D. after he killed Nicole. This theory is supported by Garrett's admission to police that he killed C.D. because C.D. saw Garrett murder Nicole. It is also supported by Garrett's statement to Dr. Reardon that he killed C.D. because he "refused to let anyone else raise [his] child. [He] didn't want [his] daughter to grow up without a dad like [he] had. [Garrett] couldn't do that to her."

{¶ 135} Garrett claims that Detective Porter put words in his mouth by suggesting that Garrett killed C.D. because she saw him kill Nicole. But when Detective Porter asked Garrett during the January 7 interview whether Garrett had killed C.D. because "she saw [him] do it to her mom," Garrett replied, "Yes, because of that." Thus, this claim lacks merit.

### 2. Manifest weight

{¶ 136} A claim that a jury verdict is against the manifest weight of the evidence involves a different test.

To evaluate a claim that a jury verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial.

*Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, at ¶ 168.

{¶ 137} Garrett argues that the verdict as to Counts Two and Three and the death-penalty specifications was against the manifest weight of the evidence. He claims the evidence shows he did not act purposely or with prior calculation and design and that a preponderance of the evidence shows that he was NGRI.

{¶ 138} Dr. Reardon concluded that Garrett was insane at the time he murdered C.D. because of an "acute dissociative episode," and that "he was unable to appreciate the wrongfulness of his acts." Dr. Martell, the state's expert, disagreed with Dr. Reardon for two reasons: (1) because Dr. Reardon's diagnosis was based on Garrett's self-reporting that he was unable to recall killing C.D. and (2) because of the severity of the attack on her. Dr. Martell also stated that there were "a number of behaviors before, during and after the killings that reflect upon Garrett's knowledge of wrongfulness regarding the killings," including: (1) telling Dr. Reardon that he debated with himself whether to do it or go home, right up to the moment of the attack, (2) deciding to kill C.D. because she saw Garrett kill Nicole, (3) fleeing the crime scene with the murder weapon, (4) hiding the knife and his bloody clothes, and (5) denying any knowledge of the murders to the police and lying to them about how he cut his hand.

{¶ 139} Garrett argues that Dr. Reardon's testimony is more credible because, unlike Dr. Martell, Dr. Reardon met with Garrett, performed robust

testing, and conducted numerous interviews. But the fact that one expert interviewed Garrett and reviewed additional materials did not compel the jury to accept that expert's diagnosis. *See State v. Self*, 4th Dist. Ross No. 04CA2767, 2005-Ohio-1259, ¶ 22. When the jury hears testimony from competing experts with opposite opinions, such that the evidence was susceptible to more than one interpretation, as here, the jury's verdict is not against the manifest weight of the evidence. *See State v. Thomas*, 70 Ohio St.2d 79, 79-81, 434 N.E.2d 1356 (1982).

{¶ 140} In addition, Garrett's police statement that he killed C.D. because she witnessed him kill her mother strongly suggests that he was not insane when he murdered C.D. And as Dr. Martell stated, Garrett's actions after murdering C.D. belie his NGRI claim.

{¶ 141} " 'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, at ¶ 42, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). The evidence does not weigh heavily in favor of finding insanity. Thus, we reject Garrett's manifest weight argument.

{¶ 142} Based on the foregoing, we reject proposition of law No. VII.

**F. Prosecutorial misconduct**

{¶ 143} In proposition of law No. XI, Garrett argues that the prosecutor committed misconduct during both phases of the trial. Except where noted, however, defense counsel failed to object and thus forfeited all but plain error. *State v. Wade*, 53 Ohio St.2d 182, 373 N.E.2d 1244 (1978), paragraph one of the syllabus.

{¶ 144} The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). The touchstone of the analysis "is the fairness of the trial, not the culpability of the

prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

*1. Voir dire*

{¶ 145} Garrett argues that during voir dire, the prosecutor misstated the state's burden of proof regarding the aggravating circumstances outweighing the mitigating factors. The prosecutor told the jurors that (1) "just a tip of the scales was enough," (2) "one scale is tipped the other way," and (3) "[i]t doesn't have to be by a lot[; it's] just that they simply outweigh the mitigating factors."

{¶ 146} The prosecutor's shorthand references to the weighing process were imprecise. The correct test is whether the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. *See* R.C. 2929.03(D)(1) and (2). Regardless, no plain error occurred. Any misstatements were cured by the trial court's instructions prior to the mitigation-phase deliberations. *See Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, at ¶ 128.

*2. Trial-phase opening statement*

{¶ 147} Garrett contends that the prosecutor's opening statement inflamed the jury by referring to the murder weapon as a "Rambo knife." In support of his argument, Garrett cites *State v. Thomas*, 152 Ohio St.3d 15, 2017-Ohio-8011, 92 N.E.3d 821. In *Thomas*, the victim died from a stab wound to the neck. Without objection, the state introduced five knives that were seized from the defendant's residence but were unrelated to the murder. The prosecutor described them to the jury as " 'full Rambo combat knives.' " *Id*. at ¶ 48. We held that the admission of the knives violated Evid.R. 404(B) and amounted to plain error because the state *knew* that the knives were not used in the murder. *Id*. at ¶ 45, 49. But, unlike in *Thomas*, in this case the prosecutor was referring to the knife used in the murders. Thus, *Thomas* is inapposite.

{¶ 148} "During opening statements, counsel is accorded latitude and allowed fair comment on the facts to be presented at trial." *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 157. Here, the prosecutor's characterization represented "fair comment" because the murder weapon was a 12-inch hunting knife. Thus, no plain error occurred.

{¶ 149} Second, Garrett argues that the prosecutor improperly characterized the murders as "butchering" and asked the jurors: "Who would have done this savage, brutal, vicious crime against a four-year-old and her mother?" Garrett also argues that the prosecutor improperly described C.D. as a "little baby." Given the evidence that Garrett inflicted numerous wounds on Nicole and C.D. with a 12-inch hunting knife, the prosecutor's statement that the victims were butchered represented fair comment. *See State v. Gunn*, 2d Dist. Montgomery No. 16617, 1998 WL 453845, *16 (describing the defendant as a "butcher" was "fair argument" given that the victim had 50 knife wounds and was shot four times). The prosecutor's descriptive question about this "savage, brutal, [and] vicious crime" was also a fair comment. The prosecutor's reference to C.D. as a "little baby" was imprecise, but the jurors had been told that she was four years old. Thus, no plain error occurred.

{¶ 150} Third, Garrett argues that the prosecutor improperly offered opinions and speculated about Garrett's sanity during opening statements. Over defense counsel's objection, the prosecutor stated:

> Dr. Reardon is going to tell you [Garrett] was legally insane and didn't know what he was doing was wrong.
>
> But when he says to Detective Porter the reason I did it was [C.D.] saw me kill mom and I needed to kill her. Disposing of a witness is certainly something that you know what you're doing and you know it's wrong. He fled the scene. He had to kill her

because she was a witness.  He also told Dr. Reardon he did it because he refused to let someone else raise his child, which again tells me that, you know, he knew what he did was wrong.  He was killing her for a purpose, at least if you believe Dr. Reardon.

\* \* \*

The evidence that Dr. Reardon, you know, ignores establishes he knew what he did was wrong.  He didn't answer his phone that whole day.  I guess his phone was being burnt up by the police and relatives and friends as it became known that this little girl and her mom had been murdered.

The trial court instructed the prosecutor not to use the first person—i.e., "I believe" or "I think."  Otherwise, the trial court overruled defense counsel's objection, stating that the prosecutor has some "leeway" to comment on what the evidence will show and the strength of the defense case.

{¶ 151} A prosecutor may not express his or her personal opinion as to the guilt of the accused.  A prosecutor may, however, express a conclusion of guilt based on what the state believes that the evidence will show.  *See State v. Gibson*, 4th Dist. Highland No. 03CA1, 2003-Ohio-4910, ¶ 39-40.  Here, the prosecutor addressed Dr. Reardon's expected testimony about Garrett's sanity, stating that Dr. Reardon's conclusion ignored evidence showing that Garrett purposely killed both victims.  Such comments were proper.

{¶ 152} Fourth, Garrett argues that the prosecutor made disparaging comments by stating: "This knife was taken by him out of his car, his Cadillac STS, I might add.  He's not paying child support, but he's driving a Cadillac." The prosecutor's statement pointed out that Garrett's lifestyle (driving a Cadillac) belied his statement to the police about his "substandard" mode of living and his

inability to pay child support. These comments were not made to inflame the jury. The prosecutor's argument was fair comment, and no plain error occurred.

### 3. Trial-phase testimony

{¶ 153} Garrett argues that the prosecutor improperly elicited the following testimony from the police officer who seized his clothing:

> Q: Okay. Now, the—the items that I've shown you, do those appear to be in clean condition? Do they appear to be nice clothing items, nice hats, wallet, that type stuff?
>
> A: Yes, ma'am.

{¶ 154} Garrett also argues that the prosecutor improperly introduced photographs of Garrett's workout equipment that was in his apartment.

{¶ 155} Evid.R. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus.

{¶ 156} As discussed above, evidence about Garrett's lifestyle was relevant in refuting Garrett's claim about his "substandard" mode of living and his inability to pay child support. Thus, the prosecutor properly elicited testimony about Garrett's nice clothing that had been seized when he was arrested and his workout equipment that he had in his apartment. No plain error occurred.

### 4. Trial-phase closing arguments

{¶ 157} Garrett also alleges that the prosecutor committed misconduct during trial-phase closing arguments.

{¶ 158} First, Garrett contends that the prosecutor improperly submitted the following argument to the jury: "I would submit to you that when Nicole was getting stabbed, she didn't think that her daughter was in any danger because she was the one with issues with him, not her daughter." The prosecutor erred when he invited the jury to consider what Nicole was thinking in the last moments of her life, because such argument "invites the jury to speculate on facts not in evidence." *State v. Wogenstahl*, 75 Ohio St.3d 344, 357, 662 N.E.2d 311 (1996). However, the prosecutor's comments were mitigated by the trial court's instruction that closing arguments were not evidence. *See State v. Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716, ¶ 117. Thus, no plain error occurred.

{¶ 159} Garrett also contends that the prosecutor improperly argued that "[Garrett] said that [C.D.] ran, she was screaming and he had to chase her down. Ask yourselves why she was screaming? Because her daddy that she hadn't seen for months was there and instead of greeting her with a hug and a kiss, he's stabbing her mommy and then he's coming for her." Here, the prosecutor's explanation for C.D.'s screaming was based on reasons gleaned from the evidence and was not improper.

{¶ 160} Second, Garrett argues that the prosecutor improperly made the following "graphically laden argument": "There's a lot of blood on that snow. That's where the attack on Nicole took place." The prosecutor later asked the jury: "And as he's stabbing, slicing, cutting both of these victims, what is his purpose?" These arguments include factual statements describing the murders and their aftermath and were supported by the evidence. No plain error occurred.

{¶ 161} Third, Garrett argues that the prosecutor denigrated him by arguing:

And then he says something strange. He wants them to post it on Facebook. He wants them to write his story so that they will— They'll all understand and people won't look at [him] as a maniac. Literally that sounds a lot like the schizoid personality disorder, someone who cares about what people think of them. You be the judge of that.

{¶ 162} Dr. Reardon diagnosed Garrett with a schizoid personality disorder and explained that a person with that disorder, like Garrett, copes with life by staying "separate from people * * * liv[ing] * * * life with people but apart from people." While the prosecutor may have misspoken by saying that Garrett's desire to have his friends post his story on Facebook "[l]iterally * * * sounds a lot like the schizoid personality disorder," the prosecutor later stated in the penalty-phase, "[W]e don't have a recluse. We don't have someone who is a social hermit." Indeed, the prosecutor was clearly questioning Garrett's schizoid-personality-disorder diagnosis. The prosecutor attempted to call Garrett's diagnosis into question because Garrett's concern about what other people think of him seems to run counter to someone diagnosed with a schizoid personality disorder. These comments were grounded in the evidence, and no plain error occurred.

{¶ 163} Fourth, Garrett contends that the prosecutor improperly undermined Dr. Reardon's report by saying, "a mere two weeks later, no more tests, no more meetings, no more interviews with this man, he flip-flops, a 180, and says I got to prepare for you a not guilty by reason of insanity plea." The prosecutor's argument that Dr. Reardon "flip-flops" in changing his opinion about Garrett's sanity merely highlighted what the evidence seemed to indicate. This was proper. *See State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 28.

{¶ 164} Fifth, Garrett argues that the prosecutor's argument that the police found "some condoms under the bed" was irrelevant and prejudicial. The state asserts that the condoms showed that Garrett had girlfriends, which undermined Dr. Reardon's testimony that Garrett had a schizoid personality disorder because to be interested in having a sexual relationship would be unusual for people with schizoid personality disorder. Although the statement about finding condoms under Garrett's bed was of questionable relevance, no plain error occurred.

{¶ 165} Sixth, Garrett asserts that the prosecutor improperly introduced evidence that the police found a knife at his apartment that was unrelated to the charged crimes. But the prosecutor's comments were relevant in refuting Garrett's initial police statement that he had injured his hand with a steak knife while opening a package. This claim is also rejected.

*5. Mitigation-phase opening statement*

{¶ 166} Garrett argues that the prosecutor misspoke during the mitigation-phase opening statements. First, Garrett argues that the prosecutor diminished the burden of proof as to mitigation by stating to the jury: "The state submits the evidence you will hear today will not be of any weight or credibility that you should give to outweigh that strong two or more specifications." He also argues that the prosecutor improperly stated: "[W]hat you hear today will not diminish the appropriateness of the death sentence in this case."

{¶ 167} But "[p]rosecutors can urge the merits of their cause and legitimately argue that defense mitigation evidence is worthy of little or no weight." *State v. Wilson,* 74 Ohio St.3d 381, 399, 659 N.E.2d 292 (1996). And, in any event, the trial court fully instructed the jury on the burden of proof and the weighing of the mitigating factors. No plain error occurred.

{¶ 168} Next, Garrett claims that the prosecutor improperly insinuated that Dr. Reardon's diagnosis must bear a relationship to Garrett's crimes by arguing that "a diagnosis in 2007 of a reattachment [sic] disorder, certainly on January 5

of 2018 does not diminish the appropriateness of the death sentence for his conduct." Here, the prosecutor was discussing the R.C. 2929.04(B)(3) mitigating factor, which states: "Whether *at the time of committing the offense*, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law." (Emphasis added.) The prosecutor's remarks represented fair comment.

### 6. Mitigation-phase closing arguments

{¶ 169} Garrett also contends that the prosecutor committed three instances of misconduct during the mitigation-phase closing arguments.

{¶ 170} First, Garrett challenges the following rebuttal argument by the prosecutor: "What's mitigating about butchering the mother of his child 49 times with that footlong Rambo knife?" However, the trial court sustained defense counsel's objection to this argument and instructed the jury to consider the "nature and circumstances of the offenses" only when they had mitigating value. Thus, no prejudicial error occurred. *See Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, at ¶ 130.

{¶ 171} Second, Garrett argues that the prosecutor improperly stated that "it's the State's burden to prove that the aggravating circumstances outweigh those mitigating factors, could be by a lot (demonstrating), could be by a little (demonstrating), it doesn't matter. It's just that it outweighs." The prosecutor's inexact comments did not result in plain error. The trial court's final instruction correctly informed the jury about the weighing process, including the burden of proof, and cured any misstatements. *See State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 92.

{¶ 172} Third, Garrett argues that the prosecutor improperly stated that Garrett's reactive-attachment-disorder diagnosis was made in 2007 and that there was no evidence that the diagnosis affected his actions on January 5, 2018.

However, the prosecutor could argue that defense mitigation was entitled to little weight.  Thus, no plain error occurred.

### 7. Cumulative prejudice

{¶ 173} Finally, Garrett argues that the cumulative effect of the prosecutor's misconduct denied him a fair trial.  But when the evidence is viewed in context of the entire trial, it does not show that the prosecutor's conduct prejudicially affected Garrett's substantial rights.  *See State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.2d 508, ¶ 291.

{¶ 174} Based on the foregoing, we reject proposition of law No. XI.

### G. Trial-phase ineffective assistance of counsel

{¶ 175} In proposition of law No. XII, Garrett raises various claims that his counsel provided ineffective assistance during the trial phase.

{¶ 176} Reversal of a conviction for ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient and second, that the deficient performance prejudiced the defendant so as to deprive the defendant of a fair trial.  *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *accord State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus.

### 1. Failure to challenge seated juror No. 31

{¶ 177} Garrett argues that his counsel were ineffective by failing to challenge seated juror No. 31 for cause because of that juror's dyslexia.  Seated juror No. 31 explained that he had required assistance to complete his questionnaire by having someone read it to him and write down his answers.  Seated juror No. 31 also stated that he had difficulty understanding large words and that retaining legalese would be problematic for him.

{¶ 178} The trial court seated juror No. 31 and then discussed possible accommodations:

THE COURT: Do you think if you were selected for this jury and there was another jury member back there who was willing to or able to go over it with you or to talk about, you know, some of [the] definitions with you, would—I mean, would that be helpful?

[SEATED] JUROR NO. 31: Oh, yes. It obviously would be helpful.

THE COURT: You're clearly a very smart man. Your answers today have been very thoughtful and well considerable [sic]. So, you know, I just want to make sure—You know, we're going to have—At the close of the case I'm going to read you out loud the jury instructions, but you're going to have a paper copy as well.

[SEATED] JUROR NO. 31: Yes.

THE COURT: If—I'm going to read it out to you and then you'll be back there with the other members of the jury. Do you think that would be sufficient for you to understand the instructions that I give you? You know, with the idea that if—You know, if you're having a discussion with the other members of the jury, they can kind of talk about what—You know, what the definitions are.

[SEATED] JUROR NO. 31: I think so, but if—You know, if it's a lot of instructions, I kind of describe it as, okay, some of it soaks in, but if you give me too much information, I've got to get rid of a little bit of it to retain some of the other part of it and that's my concern is remembering from beginning to end the instructions that you give me to follow.

> THE COURT: You—You would have the ability to—If you had a question, to come back out and I can reread it. Would that be helpful maybe? You know, if you go back there and you're in day two of your discussions and you need me to reread something to you, I can do that. Would that be helpful?
>
> [SEATED] JUROR No. 31: Yes, it would.

(Capitalization sic.)

{¶ 179} The assistant prosecutor then asked seated juror No. 31 about reviewing documentary evidence. The assistant prosecutor explained that the parties "may submit pieces of evidence, pieces of paper that have a lot of writing" and that, although the trial court and counsel "would go over all of that in court," the evidence "would also go back into the jury room." The assistant prosecutor's questioning continued:

> [ASSISTANT PROSECUTOR]: Would you be comfortable dealing with written evidence?
>
> [SEATED] JUROR NO. 31: Would that be discussed with the other jurors?
>
> [ASSISTANT PROSECUTOR]: Yes. Yes, it could be.
>
> PROSPECTIVE JUROR NO. 31: That would help. Would I retain every single thing and would I be able to look back at the paper and say, oh, yeah? I probably wouldn't be able to do that. I'm going to retain what I hear by verbally hearing it being spoken to me by the Judge or, you know, the other people in the case and hopefully I retain most of it.

(Capitalization sic.)

{¶ 180} Seated juror No. 31 was not questioned further about his disability. Neither Garrett nor the state challenged seated juror No. 31 for cause or exercised a peremptory challenge. Ultimately, he was seated on the jury. Seated juror No. 31 did not raise any further difficulties with hearing or considering the evidence during the trial.

{¶ 181} Garrett claims that defense counsel should have challenged seated juror No. 31, because seated juror No. 31 admitted that he would not be able to remember large amounts of information. Citing *State v. Speer*, 124 Ohio St.3d 564, 2010-Ohio-649, 925 N.E.2d 584, Garrett argues that the trial court failed to provide any reasonable accommodation to enable seated juror No. 31 to serve. Garrett also argues that asking other jurors to assist seated juror No. 31 with definitions and the evidence risked seated juror No. 31's ability to independently consider the law and the evidence.

{¶ 182} In *Speer*, we held that "[a]n accommodation made to enable a physically impaired individual to serve as a juror must afford the accused a fair trial." *Id*. at paragraph two of the syllabus. More specifically, "[t]he right to a fair trial requires that all members of the jury have the ability to understand all the evidence presented, to evaluate that evidence in a rational manner, to communicate effectively with other jurors during deliberations, and to comprehend the applicable legal principles as instructed by the court." *Id*. at ¶ 25.

{¶ 183} But the facts in *Speer* are distinguishable. In that case, a juror said during voir dire that the only way she could understand what someone was saying was to see their face and read their lips. The trial court denied the challenge for cause. To accommodate the juror's impairment, the court placed her in the front row of the jury box and asked counsel to turn toward her when speaking so she could read their lips.

{¶ 184} The court of appeals reversed the conviction on the grounds that these accommodations were insufficient to ensure the defendant received a fair

54

trial, and we affirmed. The decision hinged on the fact that both the state and defense relied on a 9-1-1 call as evidence relevant to whether the defendant committed the charged offenses. The state argued that defendant's " 'calm tone' " and " 'demeanor on the 9-1-1 tape' " provided evidence of his guilt. *Id.*, 124 Ohio St.3d 564, 2010-Ohio-649, 925 N.E.2d 584, at ¶ 27. Even seated in the front row of the jury box, the juror was unable to perceive the tone and inflection of the 9-1-1 tape.

{¶ 185} Unlike in *Speer*, Garrett points to nothing that prevented seated juror No. 31 from fairly considering the evidence that was presented at trial. Seated juror No. 31 assured the court that discussing legal definitions and reviewing evidence with other jurors and requesting the court to repeat instructions when necessary were accommodations that would allow him to perceive and evaluate the evidence. Garrett's complaint that seated juror No. 31 was unable to independently consider the law and evidence due to his reliance on other jurors to interpret and remember information for him is speculative. *See State v. Jackson*, 4th Dist. Athens No. 18CA7, 2020-Ohio-7034, ¶ 27-28 (record showed that juror was able to understand all testimony, evidence, argument, and instructions with functioning hearing aids).

{¶ 186} In addition, defense counsel arguably had legitimate tactical reasons for not challenging seated juror No. 31. During voir dire, seated juror No. 31 indicated that Garrett's lack of a prior criminal record and mental-health history would be important mitigating factors. And on his questionnaire, seated juror No. 31 indicated that he understood the importance of expert testimony. Thus, Garrett fails to establish that defense counsel were deficient by failing to challenge seated juror No. 31.

*2. Conceding the horrible nature of the crimes*

{¶ 187} Although Garrett concedes that counsel's strategy to acknowledge his guilt made sense, he argues that defense counsel were ineffective by telling

prospective jurors during general voir dire that "this is a horrible, horrible case" and that it "might be one of the hardest cases in Franklin County history just how horrible this is." Garrett also argues that counsel were ineffective during opening statements by stating, "We agree * * * that these were horrific, disgusting, almost unimaginable crimes that were committed by Kristofer Garrett."

{¶ 188} Defense counsel's statements do not reflect deficient performance. The defense can legitimately choose a strategy that is aimed at building a rapport with the jury. *Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, at ¶ 412. Counsel's candid acknowledgment that Garrett committed "horrific, disgusting, and almost unimaginable" crimes could have helped build such rapport. *See Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, at ¶ 225. Thus, this ineffectiveness claim is rejected.

### 3. Failure to object to police opinions

{¶ 189} Garrett argues that his counsel were ineffective by failing to object to Detective Daniel Douglas's testimony that Garrett could have cut his own hand because "when you're in the act of this altercation," the bloody handle of the knife will get slippery, causing the hand to "slide over and onto the blade." Garrett also complains that counsel failed to object when Detective Porter testified that "in a repeated stabbing the suspect's hand will slide up and down * * * and on a knife they may cut themselves in the motion of stabbing."

{¶ 190} Evid.R. 701 applies to opinion testimony from lay witnesses. It states:

> If the witness is not testifying as an expert, the witness'
> testimony in the form of opinions or inferences is limited to those
> opinions or inferences which are (1) rationally based on the
> perception of the witness and (2) helpful to a clear understanding
> of the witness' testimony or the determination of a fact in issue.

{¶ 191} Testimony about the knife wounds meets the requirements of Evid.R. 701 because it was based on Detective Douglas's and Detective Porter's perceptions and clarified the cause of Garrett's injuries. Garrett argues that neither witness had the amount of experience necessary to offer opinions about wounds caused by a slippery knife. But Detective Douglas's opinion was based on his experience in processing crime scenes, and Detective Porter's opinion was based on his experience as a homicide detective. Thus, both officers were qualified to provide lay testimony under Evid.R. 701. *See State v. Coit*, 10th Dist. Franklin No. 02AP-475, 2002-Ohio-7356, ¶ 40 (experience as a police officer and familiarity with blunt-force trauma and past observation of wounds permitted detective's testimony that cuts on victim's leg were consistent with being hit by a brick).

{¶ 192} Defense counsel also were not ineffective by failing to object to Detective Douglas's and Detective Porter's experience because forgoing an objection avoided bolstering the detectives' credentials in front of the jury.

{¶ 193} Next, Garrett complains that defense counsel were ineffective because Detective Porter's testimony about the slippery knife warranted an objection as cumulative evidence. Even assuming that Porter's testimony was cumulative, Garrett cannot demonstrate prejudice because of the overwhelming evidence of his guilt. *See Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, at ¶ 222.

{¶ 194} Finally, Garrett argues that defense counsel were ineffective by failing to object to Detective Porter's testimony that the person who had killed Nicole and C.D. was "very angry" at them. But Detective Porter's opinion about the killer's anger was relevant because it indicated that the murders were likely a crime of passion rather than a random act of violence or a robbery gone wrong. Furthermore, the state presented evidence that Garrett was angry at Nicole, so it

was relevant that the crime scene indicated the assailant was angry during the murders. Therefore, any objection by defense counsel was unlikely to be sustained. Moreover, given the overwhelming evidence of Garrett's guilt, Detective Porter's brief comment was not prejudicial. This ineffectiveness claim also lacks merit.

### 4. Failure to object to time limits for closing arguments

{¶ 195} Garrett argues that his counsel were ineffective by failing to object to the trial court's time limitation of 30 minutes for each side for the trial phase's closing arguments.

{¶ 196} Before the start of closing arguments, the trial court asked each side to limit arguments to 30 minutes and 10 or 15 minutes for rebuttal. When asked whether that would be enough time, defense counsel answered: "Plenty. There's only one issue." And cocounsel added: "He's the boss on that one, but that sounds like plenty to me." Toward the end of defense counsel's argument, the trial court advised counsel that he had only five minutes remaining. Defense counsel responded: "I'm sorry, thank you. I'll wrap it up. I'm getting there." Shortly thereafter, defense counsel stated: "I'm going to wrap this up a little quicker."

{¶ 197} The time permitted for closing arguments is within the trial court's sound discretion. *State v. Ferrette*, 18 Ohio St.3d 106, 110, 480 N.E.2d 399 (1985); *see also State v. Jenkins*, 15 Ohio St.3d 164, 221, 473 N.E.2d 264 (1984). The exercise of such discretion " 'will not be interfered with by an appellate tribunal in the absence of a clear showing of its abuse to the prejudice of the substantial rights of the complaining party.' " *Braeunig v. Russell*, 170 Ohio St. 444, 446, 166 N.E.2d 240 (1960), quoting 53 American Jurisprudence, Section 461, at 364-365 (1945).

{¶ 198} Garrett contends that defense counsel should have objected to the 30-minute time limit because of this being an aggravated-murder case with

multiple witnesses and hundreds of pages of exhibits. However, defense counsel said that 30 minutes was "plenty" of time. Garrett also argues that counsel should have objected when the trial court informed counsel that he had five minutes to wrap up his argument. But Garrett fails to specify any additional points that counsel failed to make because he may have been hurried in completing his argument. Under these circumstances, Garrett fails to show that counsel's failure to object was deficient or prejudicial.

### 5. Other ineffective-assistance allegations

{¶ 199} Garrett raises other instances of trial-phase ineffectiveness of counsel. But as discussed in other propositions of law, even if counsel were deficient, Garrett has failed to establish that he was prejudiced by:

- Counsel's failure to object to the trial court's closure of the courtroom to minors;

- Counsel's failure to object to the prosecutor's statements about weighing the aggravating circumstances and mitigating factors during voir dire;

- Counsel's failure to object to cumulative, gruesome photos of Nicole and C.D.; and

- Counsel's failure to object to the prosecutor's characterization of Garrett's clothing and other personal items.

### 6. Cumulative error

{¶ 200} Finally, Garrett argues that defense counsel's cumulative errors and omissions violated his constitutional rights. However, because none of Garrett's claims of ineffective assistance have merit, he cannot establish a right to relief by simply joining these claims together. *See Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 173.

{¶ 201} Based on the foregoing, we reject proposition of law No. XII.

**H. Readmission of trial-phase evidence**

{¶ 202} In proposition of law No. X, Garrett argues that the trial court's readmission of all the trial-phase evidence during mitigation violated his rights to due process and a fair trial. However, defense counsel did not object to the readmission of this evidence and forfeited all but plain error. *See Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, at ¶ 357.

{¶ 203} As an initial matter, the state invokes the invited-error doctrine. The doctrine of invited error specifies that a litigant may not "take advantage of an error which he himself invited or induced." *Hal Artz Lincoln–Mercury, Inc. v. Ford Motor Co., Lincoln–Mercury Div.*, 28 Ohio St.3d 20, 502 N.E.2d 590 (1986), paragraph one of the syllabus. "This court has found invited error when a party has asked the court to take some action later claimed to be erroneous, or affirmatively consented to a procedure the trial judge proposed." *State v. Campbell,* 90 Ohio St.3d 320, 324, 738 N.E.2d 1178 (2000). Here, the invited-error doctrine does not apply because defense counsel's failure to object did not invite error.

{¶ 204} R.C. 2929.03(D)(1) provides that at the penalty stage of a capital proceeding, the jury shall consider, among other things, "any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing * * * [and] hear testimony and other evidence that is relevant to the nature and circumstances of the aggravating circumstances the offender was found guilty of committing."

{¶ 205} Garrett argues that the state could reintroduce only the minimal evidence relevant to proving the aggravating circumstances. However, R.C. 2929.03(D)(1) does not limit the quantity of evidence relevant to the aggravating circumstances that the state may reintroduce during mitigation. *See State v. DePew*, 38 Ohio St.3d 275, 282-283, 528 N.E.2d 542 (1988). Thus, this claim lacks merit.

**{¶ 206}** Next, citing *Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, at ¶ 92, Garrett argues that the evidence related to the nature and circumstances of an offense may be readmitted only if the defense offers the evidence as mitigation, which the defense did not do here. *Belton* held that R.C. 2929.04(B) and (C) prohibit *reference* to "the nature and circumstances of the offense *as a factor to be considered in mitigation* unless and until offered by defendant." (Emphasis sic.) *Id.* But reference to the nature and circumstances of the offense is different from the introduction of evidence related to the aggravating circumstances. *Belton* makes no holding regarding the introduction of evidence related to the aggravating circumstances in the mitigation phase. And to the extent that the prosecutor inappropriately referred to the nature and circumstances of the offenses in this case, this error did not prejudice Garrett, because the trial court sustained the defense's objection to the prosecutor's remarks and then instructed the jury to only consider the nature and circumstances of the offense if they have mitigating value.

**{¶ 207}** Garrett also argues that the overbroad readmission of the evidence was not relevant to the aggravating circumstances because the crime-scene and autopsy photographs of Nicole and C.D. and most of the testimonial evidence had nothing to do with the aggravating circumstances. As discussed in proposition of law No. IV, some of the crime-scene photographs were repetitive and should not have been admitted during trial nor readmitted during mitigation. Yet Garrett was not prejudiced by the admission of those photographs. And the remainder of the crime-scene and autopsy photographs were relevant to the course-of-conduct aggravating circumstance. *See Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, at ¶ 355. The testimonial evidence also bore some relevance to the nature and circumstances of the course-of-conduct, murder-of-a-child-under-13, and escaping-detection aggravating circumstances. *See State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 241.

{¶ 208} Finally, the trial court instructed the jury to consider only the trial-phase testimony and other readmitted evidence related to the aggravating circumstances and the mitigating factors. *See Ford* at ¶ 358. Thus, no plain error occurred.

{¶ 209} Based on the foregoing, we reject proposition of law No. X.

### I. Jury-instruction claims

{¶ 210} In propositions of law Nos. I, II, and XIV, Garrett argues that the trial court erred by giving one jury instruction and failing to give two others. We reject these three propositions of law for the reasons explained below. But, in any event, our independent sentence reassessment would be sufficient to cure the errors alleged. *See State v. Twyford*, 94 Ohio St.3d 340, 352, 763 N.E.2d 122 (2002); *State v. Lundgren*, 73 Ohio St.3d 474, 493, 653 N.E.2d 304 (1995).

*1. Instructions on R.C. 2929.04(B)(3) mitigating factor*

{¶ 211} In proposition of law No. I, Garrett argues that the trial court erred by instructing the jury on the mental-disease-or-defect mitigating factor, R.C. 2929.04(B)(3), after defense counsel requested the trial court not to instruct on that mitigating factor. R.C. 2929.04(B)(3) allows a jury to consider and weigh against the aggravating circumstances "[w]hether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law."

### *a. Relevant facts*

{¶ 212} Before the mitigation phase began, the defense reintroduced Dr. Reardon's final report. The prosecutor's mitigation-phase opening statement stated that the mitigating factors included Garrett's claim that he "lack[ed] substantial capacity to appreciate the criminality of his conduct."

{¶ 213} During the discussion about mitigation-phase instructions, the prosecutor argued that the evidence required the court to instruct the jury as to

R.C. 2929.04(B)(3). Defense counsel responded that an instruction on R.C. 2929.04 was not being requested because the jury's verdict "looks like they may not have considered much psychological evidence at all and [the R.C. 2929.04(B)(3) mitigating factor] is so closely tailored to almost being NGRI." Defense counsel added that "I think it will confuse the jury if we go forward trying to argue that as a mitigating factor." The following colloquy ensued:

> THE COURT: Is it going to be referenced, though, in closing arguments, I guess? Because they've already—The testimony of Dr. Reardon has been admitted for this hearing and—And the reports have been admitted.
>
> [DEFENSE COUNSEL]: Sure. We—We can still argue it. We're just asking the Court not to instruct them on a specific mitigating factor in the statute.
>
> THE COURT: Okay. Well—
>
> [DEFENSE COUNSEL]: We can argue it as part of the catchall if we want to, I imagine, but—
>
> THE COURT: I'm going—I'm going to leave it in there—

(Capitalization sic.)

{¶ 214} The prosecutor discredited the R.C. 2929.04(B)(3) mitigating factor during the mitigation-phase closing argument:

> [T]he Judge will instruct you that a mitigating factor could be whether at the time the offense was committed the Defendant, because of a mental disease or defect—This is different than not guilty by reason of insanity that because of that mental disease or

defect he lacked the substantial capacity to know the wrongfulness of his actions.

* * *

And Dr. Reardon told you about the hallmarks of schizoid personality disorder. He told * * * you someone with that disorder neither enjoys nor desires close relationships, including being part of a family. Now, think about the testimony that you heard today, the testimony of his grandma, the woman who he went over and he mowed her grass, he shoveled her snow. He would come over and take care of her. The testimony of Adrienne Hood, not even his family, not even his blood family, go to cookouts, come over to the house all the time. The testimony of Samantha Loveless, cookouts, birthday parties, Christmas, Thanksgiving. That's being part of a family, seeking out those close relationships.

* * *

Dr. Reardon also talked to you about reactive attachment disorder and that that diagnosis was made in 2007. There's been no evidence that in 2018 that there had been the most recent diagnosis or how, if at all, that that diagnosis impacted how he reacted, how he acted on January 5, 2018.

{¶ 215} Defense counsel countered this argument, stating:

These factors that the State wants to bring up again today, I'm— I'm confused as to where its relevance is when we're not talking about the state of mind at the time of the offense. We're past that. That's not what we're here for.

* * *

Nonetheless, those were arguments we were making because of Dr. Reardon's findings regarding [Garrett]. If we get— We get a report back from a doctor that says NGRI, what are we supposed to do? Wad that up and throw it in a trash can? No we have to go forward with that.

And, again, you've reached your decision on that. I just am, quite frankly, fearful that you will take that—That testimony regarding the mental illnesses suffered by our client—Diagnosed regarding our client, that you will just crumple those up and throw them away when you go back in that deliberation room.

Defense counsel asked the jurors to consider Garrett's mental illnesses under the "catchall" provision in R.C. 2929.04(B)(7), stating: "The instruction is you can take anything from the trial phase and use it in your determination."

{¶ 216} The final instructions on the mitigating factors included R.C. 2929.04(B)(3). The trial court added, "The Defense introduced evidence of multiple factors that they believe are mitigating in this case. You must consider each factor and give it what weight you deem appropriate."

{¶ 217} Following defense counsel's objection to the trial court's instruction as to R.C. 2929.04(B)(3), the trial court stated: "I just think there was too much evidence and focus on that information to not instruct the jury on that as a mitigating factor would—Would cause confusion, but I will note—I just think that bell can't be unrung and that's why I thought it was important to give them the instruction * * *."

### b. Analysis

{¶ 218} As an initial matter, the state argues that Garrett failed to preserve the issue pertaining to the trial court's decision to instruct the jury as to R.C. 2929.04(B)(3) by stating, "Well, that's up to the Court. We're just not requesting

it." Crim.R. 30(A) provides: "On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds for the objection." But defense counsel clarified the objection, adding, "We're just asking the Court not to instruct [the jury] on a specific mitigating factor in the statute." And following jury instructions on R.C. 2929.04(B)(3), defense counsel stated, "We did not ask for that. We want the record to be clear on that." In overruling the objection, the trial court stated, "I will note your objection to that for the record." Thus, Garrett preserved this issue for review.

{¶ 219} Citing *DePew*, 38 Ohio St.3d at 289, 528 N.E.2d 542, Garrett argues that because defense counsel did not present evidence on R.C. 2929.04(B)(3) as a mitigating factor, the trial court was prohibited from instructing the jury on it.

{¶ 220} In *DePew*, defense counsel objected to references to mitigating factors not raised by the defense, arguing that they focused the jury's attention on the number of mitigating factors absent from the defendant's case. *Id*. We stated:

> R.C. 2929.04(B) and (C) deal with mitigation and were designed to enable *the defendant* to raise issues in mitigation and to facilitate his presentation thereof. If the defendant chooses to refrain from raising some of or all of the factors available to him, those factors not raised may not be referred to or commented upon by the trial court or the prosecution. When the *purpose* of these sections is understood, it is clear that such comment is appropriate only with regard to those factors actually offered in mitigation by the defendant.

> * * * Thus, it is the defendant who has the right to present and argue the mitigating factors. If he does not do so, no comment on any factors not raised by him is permissible.

(Emphasis sic.) *DePew* at 289; *see also Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, at ¶ 92 (*DePew* prohibited prosecutor from commenting on the nature and circumstances as a mitigating factor to consider when defense did not offer them as mitigating evidence).

{¶ 221} Garrett argues that counsel chose not to raise the R.C. 2929.04(B)(3) factor during mitigation because the jury had already rejected Garrett's NGRI defense and presenting a mental disease or defect defense again would be extremely prejudicial. Garrett asserts that counsel's defense strategy was to present a mix of family and friends and his football coach to testify about his chaotic childhood. He also argues that the trial court's instruction on the R.C. 2929.04(B)(3) mitigating factor was unnecessary, because the "catchall" mitigating factor, R.C. 2929.04(B)(7), allowed the jury to consider his mental health as a mitigating factor.

{¶ 222} The state argues that Garrett raised R.C. 2929.04(B)(3) during mitigation by resubmitting Dr. Reardon's NGRI report, because the NGRI standard subsumes the standard under R.C. 2929.04. Insanity requires an absolute inability to appreciate the criminality of one's conduct, whereas the mitigating factor of diminished capacity requires only the lack of substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law. *See State v. Dickerson*, 45 Ohio St.3d 206, 210, 543 N.E.2d 1250 (1989). Thus, while Garrett's sanity was no longer at issue, Dr. Reardon's report was relevant to establishing the mitigating factor under R.C. 2929.04(B)(3). *See State v. Cooey*, 46 Ohio St.3d 20, 33, 544 N.E.2d 895 (1989) (psychological report on sanity was deemed relevant to the R.C.

2929.04(B)(3) mitigating factor). *DePew* did not prohibit the trial court from instructing the jury as to R.C. 2929.04(B)(3), because Garrett raised R.C. 2929.04(B)(3) as a mitigating factor by resubmitting Dr. Reardon's report.

{¶ 223} Despite factual distinctions, our opinion in *State v. Garner*, 74 Ohio St.3d 49, 656 N.E.2d 623 (1995), is instructive. In *Garner*, defense counsel asked that the trial court include an instruction regarding R.C. 2929.04(B)(3). After psychologists testified, the defense withdrew its request for the instruction, stating that they were " 'not going to assert that particular mitigating circumstance.' " *Id*. at 55. *Garner* held that the trial court did not err in including the factor in its instructions:

> We will not sanction a procedure whereby the defense may effectively control the court's charge by representing that it is abandoning a particular mitigating factor based on an evaluation that the testimony of its mitigation witness was unfavorable.

*Id*. at 56. A similar rationale supports denying Garrett's claim that the trial court erred by including the instruction regarding R.C. 2929.04(B)(3).

{¶ 224} Garrett contends that the prosecutor's request for an instruction on R.C. 2929.04(B)(3) along with the prosecutor's mitigation-phase closing argument, which discredited Garrett's presentation of any evidence of the mitigating factor in R.C. 2929.04(B)(3), was unfair and offensive to due process. However, "once lawfully inserted into the sentencing considerations, such information is subject to fair comment by both parties." *State v. Greer*, 39 Ohio St.3d 236, 253, 530 N.E.2d 382 (1988).

{¶ 225} Garrett also argues that Dr. Reardon's earlier reports should not have been admitted because they were incomplete and undermined Dr. Reardon's

credibility. But those reports were relevant and necessary for a full understanding of Dr. Reardon's final report. Thus, this argument lacks merit.

{¶ 226} Finally, Garrett argues that the trial court's instruction on R.C. 2929.04(B)(3) "completely torpedoed the defense mitigation" and required defense counsel to present the discredited mental-disease-or-defect theory to the jury a second time. But during closing arguments, defense counsel explained to the jury that Garrett's state of mind at the time of the offenses was not being raised as a mitigating factor. Defense counsel asked the jury to consider Garrett's mental illness under the "catchall" mitigating factor in R.C. 2929.04(B)(7). And by directing the jury to "consider all of the testimony and—And evidence relevant to the aggravating circumstances * * * and mitigating—Mitigating factors raised at both phases of the trial," the trial court's instructions did not foreclose the jury's consideration of any mitigating evidence. *See State v. Goff*, 82 Ohio St.3d 123, 130, 694 N.E.2d 916 (1998); *Buchanan v. Angelone*, 522 U.S. 269, 278, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998). Thus, we reject Garrett's argument that the instruction pertaining to R.C. 2929.04(B)(3) "completely torpedoed the defense mitigation."

{¶ 227} Based on the foregoing, we reject proposition of law No. I.

*2. Failure to instruct on R.C. 2929.04(B)(5) mitigating factor*

{¶ 228} In proposition of law No. II, Garrett argues that the trial court erred by failing to instruct the jury on his "lack of a significant history of prior criminal convictions and delinquency adjudications" under R.C. 2929.04(B)(5). However, defense counsel's failure to object to this omission at trial forfeited all but plain error. *See State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 189.

{¶ 229} During the trial phase, Sergeant Sicilian and Detective Porter acknowledged Garrett's lack of a criminal record while interviewing Garrett. And

Dr. Reardon testified that "people generally don't start their criminal career with an offense like this."

{¶ 230} While presenting the mitigation-phase opening statement, defense counsel stated: "[Y]ou have a person in front of you that has a number of mitigating circumstances for us to present to you. Absolutely, no prior record, nothing, zero." And during the mitigation hearing, Garrett's mother testified that he "[n]ever had a problem with the law." And his grandmother stated that Garrett "wasn't one that got into trouble." And finally, during mitigation closing arguments, defense counsel asked the jurors to give "tremendous weight" to Garrett's lack of criminal history, reminding the jurors that the evidence showed his lack of a criminal record "in a number of ways." However, defense counsel did not request an R.C. 2929.04(B)(5) instruction on Garrett's lack of a criminal history and one was not given.

{¶ 231} During the sentencing hearing, the trial court discussed the failure to give such an instruction during mitigation. The trial court acknowledged that evidence of Garrett's lack of criminal history had been presented to the jury and that it was also argued by counsel in opening statements and closing arguments at the mitigation phase. Nonetheless, the court concluded that the absence of such an instruction did not "disrupt or disturb the jury's recommendation."

{¶ 232} The trial court's sentencing opinion stated that the jury was not explicitly instructed as to Garrett's lack of a significant criminal history. But the trial court stated that "this mitigating factor was presented and argued to the jury in mitigation, and the Court has considered this factor for purposes of this opinion." Thereafter, the trial court found that Garrett "had no prior criminal history, either as a juvenile or an adult, prior to these offenses" and it gave "some weight" to Garrett's lack of prior criminal convictions against the sentence of death under R.C. 2929.04(B)(5).

{¶ 233} Garrett argues that the trial court was required to instruct the jury as to R.C. 2929.04(B)(5) because his lack of a criminal record was clearly raised during mitigation. But as discussed in proposition of law No. I, the failure to give an instruction did not foreclose the jury's consideration of Garrett's lack of a criminal record. *Goff*, 82 Ohio St.3d at 130, 694 N.E.2d 916; *Buchanan*, 522 U.S. at 278, 118 S.Ct. 757, 139 L.Ed.2d 702. Testimony relating to Garrett's lack of a criminal record was discussed and argued during both phases of the trial. And the jury was instructed to "consider all of the testimony and—And evidence relevant to the * * * mitigating factors raised at both phases of the trial."

{¶ 234} Garrett also claims that the jury likely believed that they could not consider his lack of a criminal record when the trial court failed to give such instruction. But no "reasonable likelihood," *Boyde v. California*, 494 U.S. 370, 386, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), exists that the jurors understood the instructions to preclude consideration of Garrett's lack of a criminal record, particularly when the trial court instructed the jury on the catchall factor, R.C. 2929.04(B)(7), which allows the jury to consider "[a]ny other factors that are relevant." Thus, the trial court's failure to provide an instruction on R.C. 2929.04(B)(5) did not result in plain error.

{¶ 235} Based on the foregoing, we reject proposition of law No. II.

*3. Mercy as a mitigating factor*

{¶ 236} In proposition of law No. XIV, Garrett argues that the trial court erred by denying his request for an instruction on mercy during mitigation. The trial court explained to counsel at a motions hearing: "Certainly Counsel can argue mercy as under the catchall. * * * [B]ut I'm not going to give a specific instruction * * * that you must consider mercy as one of the mitigating factors."

{¶ 237} We have held that "[p]ermitting a jury to consider mercy, which is not a mitigating factor and thus irrelevant to sentencing, would violate the well-established principle that the death penalty must not be administered in an

arbitrary, capricious or unpredictable manner." *State v. Lorraine*, 66 Ohio St.3d 414, 417, 613 N.E.2d 212 (1993). Garrett acknowledges *Lorraine*'s holding but argues that it should be reexamined.

{¶ 238} Garrett cites *Kansas v. Marsh*, 548 U.S. 163, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006), and *Kansas v. Carr*, 577 U.S. 108, 136 S.Ct. 633, 193 L.Ed.2d 535 (2016), to support his claim. But neither of these cases involved this question or held that an instruction on considering mercy in mitigation is required. And we have recently considered and rejected the same arguments. *See State v. Hundley*, 162 Ohio St.3d 509, 2020-Ohio-3775, 166 N.E.3d 1066, ¶ 122; *Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, at ¶ 362.

{¶ 239} Because Garrett has presented no meritorious justification from departing from this settled law, we reject proposition of law No. XIV.

### J. Mitigation-phase ineffective assistance of counsel

{¶ 240} In proposition of law No. XIII, Garrett makes various claims that his counsel provided ineffective assistance during mitigation. As discussed earlier, in order for this court to reverse Garrett's sentence, Garrett must establish both that his counsel were deficient and that the deficient performance prejudiced his defense so as to deprive him of a fair trial. *See Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.

*1. Reliance on Dr. Reardon's report and failure to call an expert witness*

{¶ 241} Garrett argues that defense counsel were ineffective by introducing Dr. Reardon's report during mitigation without offering additional expert-witness testimony. Garrett contends that defense counsel should have called a psychologist to tie together all the evidence about Garrett's troubled upbringing, early traumas, and other social history.

{¶ 242} "The decision to forgo the presentation of additional mitigating evidence does not itself constitute proof of ineffective assistance of counsel." *State v. Keith*, 79 Ohio St.3d 514, 536, 684 N.E.2d 47 (1997). "The defense

decision to call or not call a mitigation witness is a matter of trial strategy.  * * * Debatable trial tactics generally do not constitute ineffective assistance of counsel." *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 116.

{¶ 243} Counsel in a capital case have an "obligation to conduct a thorough investigation of the defendant's background" to determine the availability of mitigating evidence.  *Williams v. Taylor*, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).  But "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 244} Nothing in the record shows that defense counsel did not conduct an adequate investigation.  Counsel hired Dr. Reardon, a mitigation specialist, a private investigator, and another psychologist to complete a neuropsychological exam on Garrett.

{¶ 245} Before the mitigation phase began, defense counsel informed the court that Dr. Reardon would not be called as a mitigation witness, because he had testified for close to four hours during the trial phase just one week earlier. Defense counsel stated that "[the] psychological history of [Garrett] would have been the exact same testimony * * * that [was] admitted in the trial phase that we would be doing again in [the] mitigation phase with the exception of the focus, of course, being on the sanity at the time of the offense."  Defense counsel added that Dr. Reardon had testified "about * * * the Children Services records—Years of abuse, neglect * * * and all of those things are already in a report that the jury has already seen."  The trial court explained that recalling Dr. Reardon might "annoy the jury as much as bolster anything that he's already talked about." Counsel agreed that the defense had to "take that into consideration also" and stated that this decision was a matter of trial strategy and that Garrett had not shown any disapproval to the "pathway" that defense counsel had chosen. Thus,

defense counsel's decision not to recall Dr. Reardon or call another psychologist to testify was a reasonable trial strategy. *See State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 195.

{¶ 246} Garrett argues that Dr. Reardon's report did not mention mitigation and focused on Garrett's mental state at the time of the offenses. But Dr. Reardon's report provided a comprehensive discussion about Garrett's chaotic upbringing, homelessness, life in foster care, educational and employment history, lack of criminal history, and the history of his relationship with Nicole. Additionally, Dr. Reardon reported the results of multiple psychological tests and Garrett's DSM-5 diagnosis and opined that Garrett was insane when he murdered C.D. Dr. Reardon's report summed up his findings about Garrett's background and psychological history, stating:

> Garrett's Reactive Attachment Disorder and other psychological conditions are, in my opinion, a consequence of some of the severe neglect and abuse that he was subjected to during his infancy, childhood, and adolescence. The evidence indicates that just about any opportunity that [Garrett] had for any kind of meaningful attachment was accompanied by disaster.

Thus, Dr. Reardon's report provided ample mitigation for the jury to consider.

{¶ 247} Nevertheless, Garrett invokes the American Bar Association's ("ABA") guidelines requiring defense counsel "to construct a persuasive narrative in support of the case for life, rather than to simply present a catalog of seemingly unrelated mitigating factors." *See* American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Guideline 10.11, Commentary (Rev.Ed. 2003), reprinted in 31 Hofstra L.Rev. 913 (2003). But the ABA guidelines are not "inexorable commands" with which all

capital defense counsel must fully comply. *Bobby v. Van Hook*, 558 U.S. 4, 9, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009); *Maxwell* at ¶ 183. Moreover, "[a]ttorneys are not expected to present every potential mitigation theory, regardless of their relative strengths." *Fears v. Bagley*, 462 Fed.Appx. 565, 576 (6th Cir.2012). Accordingly, defense counsel were not duty-bound to present psychological testimony during mitigation.

*2. Failure to elicit request for life sentence and expressions of love for the defendant from mitigation witnesses*

{¶ 248} Garrett argues that defense counsel were ineffective by failing to ask mitigating witnesses to express their love for Garrett, their desire to continue their relationship and support, and their wish that he be given a life sentence.

{¶ 249} During Garrett's mitigation hearing, defense counsel called four family members, Garrett's godmother, and his high school football coach. These witnesses helped humanize Garrett in front of the jury and showed that he had many positive characteristics as a family member and that he was a hard worker.

{¶ 250} Nothing in the record shows whether witnesses would have testified that they would have recommended a life sentence after Garrett was found guilty of the aggravated murders of Nicole and C.D. And counsel may have been concerned that answers to questions about these topics would yield lukewarm or equivocating responses, thereby damaging Garrett's case. It is also highly speculative whether additional testimony from these witnesses would have added anything to Garrett's mitigating case or made any difference in the outcome of the mitigation phase. *See Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, at ¶ 209. Thus, Garrett cannot establish that defense counsel were deficient for failing to pursue this line of questioning. *See Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, at ¶ 143.

*3. Other ineffective-assistance claims*

{¶ 251} Garrett recasts claims from other propositions of law into claims of ineffective assistance of counsel. Garrett claims that counsel were ineffective by failing to object to the readmission of all trial-phase evidence during mitigation and for failing to request an instruction on Garrett's having no prior criminal record. But as discussed in earlier portions of this opinion, even if counsel were deficient, Garrett has failed to establish prejudice.

*4. Cumulative error*

{¶ 252} Finally, Garrett argues that defense counsel's cumulative errors and omissions deprived him of his right to counsel, freedom from cruel and unusual punishment, due process, and the right to a fair trial. But this claim lacks merit because Garrett has not shown that he was prejudiced by any mitigation-phase ineffective assistance of counsel.

{¶ 253} Based on the foregoing, we reject proposition of law No. XIII.

## K. Sentencing opinion

{¶ 254} In proposition of law No. VIII, Garrett argues that the trial court's sentencing opinion contains numerous errors.

{¶ 255} R.C. 2929.03(F) sets forth the findings a trial court must make when imposing a death sentence. The court must state, in a separate opinion, the following:

[S]pecific findings as to the existence of any of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, the existence of any other mitigating factors, the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors.

{¶ 256} First, Garrett argues that the trial court limited its consideration of his mental-health issues under R.C. 2929.04(B)(3) (mental disease or defect at time of the offense) but should have considered those issues under the catchall provision, R.C. 2929.04(B)(7). Garrett complains that by doing so, the trial court did not focus on the factors that were relevant to whether Garrett should have been sentenced to death. *See Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, at ¶ 437.

{¶ 257} The trial court did not limit its consideration of Garrett's mental health to the R.C. 2929.04(B)(3) standard. The trial court gave "some weight" to Garrett's reactive-attachment disorder, stating that evidence of that diagnosis was shown by Garrett's keeping his distance from family members and his failure to disclose C.D.'s existence until nearly three years after she was born. Thus, the trial court's reasoning implicitly considered Garrett's mental health under the "catchall" provision.

{¶ 258} Garrett also contends that the trial court "never even mentioned" his unspecified bipolar disorder in its findings of fact and conclusions of law. "While a sentencing court must consider all evidence of mitigation, it need not discuss each factor individually." *State v. Phillips*, 74 Ohio St.3d 72, 102, 656 N.E.2d 643 (1995). Here, the trial court stated that "[Dr.] Reardon opined Defendant also suffers from an Unspecified Bipolar and Related Disorder." Thus, this claim also lacks merit.

{¶ 259} Second, Garrett argues that the trial court erred by not weighing all the mitigating factors cumulatively against the aggravating circumstances. Mitigating factors must be considered collectively, not individually. *See State v. Fears*, 86 Ohio St.3d 329, 345, 715 N.E.2d 136 (1999). The sentencing opinion separately addresses the nature and circumstances of the offenses; Garrett's history, nature, and background; his reactive-attachment disorder and mental state

at the time of the offenses; and his youth, IQ, lack of a prior criminal history, and remorse. The trial court then concludes that "the State of Ohio has proven beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors." Thus, the trial court individually evaluated the mitigating factors, but when weighing the mitigation against the aggravating circumstances, it considered the mitigating factors together.

{¶ 260} Third, Garrett argues that the trial court improperly discounted evidence of his history and background by stating: "Sadly, many individuals go through the foster care process, which certainly causes instability in their tender years. However, not every person who goes through foster care meticulously decides to kill 2 people in cold blood." Such comparison was not improper. *See Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, at ¶ 434. Thus, this claim also lacks merit.

{¶ 261} Fourth, Garrett asserts that the trial court erred by giving "no weight" to his IQ of 85 when it stated:

> [H]e lived independently, owned 2 vehicles, and maintained at least 1 job at all times during adulthood. Although Defendant has an I.Q. of 85, it is clear to the Court from listening to Defendant's statements that he is a bright individual capable of rational thought processes. Furthermore, Defendant was admitted to the University of Akron and Columbus State Community College.

{¶ 262} The assessment and weight of mitigating evidence are matters for the trial court's determination. *See Ford* at ¶ 437. Moreover, the fact that mitigating evidence is admissible "does not automatically mean that it must be given any weight." *State v. Steffen*, 31 Ohio St.3d 111, 102, 509 N.E.2d 383 (1987), paragraph two of the syllabus.

{¶ 263} Garrett cites *State v. Herring*, 142 Ohio St.3d 165, 2014-Ohio-5228, 28 N.E.3d 1217, and *Carter v. Bell*, 218 F.3d 581 (6th Cir.2000), in arguing that the trial court's dismissal of his low IQ is completely at odds with established case law regarding mitigating evidence. *Herring* held that defense counsel were ineffective by not presenting a variety of mitigating evidence. *Herring* at ¶ 123. And in *Carter*, defense counsel failed to investigate, discover, and present any mitigating evidence, including that Carter's "IQ tested in the borderline mentally retarded range in 1992, with a score of 79; [and that] a Beta IQ test from 1984 showed an IQ of 87." *Carter* at 593, 600. But neither opinion held that the defendant's IQ *must* be considered mitigating by the sentencer. Thus, Garrett's reliance on these cases lacks merit.

{¶ 264} Fifth, Garrett complains that the trial court's statements that Garrett "decided to remove [the victims] from his life permanently," that he engaged in a "morbid cost-benefit analysis" and a "rational thought process," and that he "killed Nicole and [C.D.] without warning" demonstrate that the trial court improperly considered the nature and circumstances of the offense as aggravating circumstances. Similarly, Garrett argues that the trial court misspoke in stating that he "laid in wait" for the victims, before "butchering" them, and that he "purposely chose that time and place to kill Nicole and his daughter."

{¶ 265} A trial court "may rely upon and cite the nature and circumstances of the offense as reasons supporting its finding that the aggravating circumstances were sufficient to outweigh the mitigating factors." *State v. Stumpf*, 32 Ohio St.3d 95, 512 N.E.2d 598 (1987), paragraph one of the syllabus. Here, the trial court's comments supported its conclusion that no mitigating value existed in the nature and circumstances of the offenses. *See State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 79. Moreover, the trial court correctly identified the three aggravating circumstances in its sentencing opinion, and we can presume that the trial court relied on only those circumstances and not on

nonstatutory aggravating circumstances. *See State v. Clemons*, 82 Ohio St.3d 438, 447, 696 N.E.2d 1009 (1998); *State v. Hill*, 73 Ohio St.3d 433, 441, 653 N.E.2d 271 (1995).

**{¶ 266}** Sixth, Garrett argues that the trial court shifted the burden of proof by stating that neither Garrett's background nor his lack of prior criminal convictions and juvenile adjudications outweighed the aggravating circumstances. The trial court's wording improperly suggested that the defense had the burden of persuasion. However, the trial court concluded that "the Court finds the State of Ohio has proven beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors against imposition of the death sentence, as found in Counts 2 and 3." Thus, when read as a whole, the sentencing opinion precludes the inference that the trial court applied the wrong burden of proof in imposing the sentence of death. *See Cooey*, 46 Ohio St.3d at 38, 544 N.E.2d 895.

**{¶ 267}** Finally, Garrett argues that the collective deficiencies of the sentencing opinion may be corrected only by remanding this case for a "new mitigation-phase jury trial." There are no deficiencies in the sentencing opinion that need to be corrected, and even if there were, our independent review would be sufficient to cure the errors. *See State v. Fox*, 69 Ohio St.3d 183, 191, 631 N.E.2d 124 (1994).

**{¶ 268}** Based on the foregoing, we reject proposition of law No. XIII.

### L. Cumulative error

**{¶ 269}** In proposition of law No. XVI, Garrett argues that his convictions and sentence should be reversed based on the doctrine of cumulative error.

**{¶ 270}** Under the doctrine of cumulative error, we will reverse a conviction when the cumulative effect of errors deprives a defendant of a fair trial even though each of the instances of trial-court error does not individually constitute cause for reversal. *Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971

N.E.2d 865, at ¶ 223; *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus.

{¶ 271} The doctrine of cumulative error is not applicable in this case. Garrett received a fair trial. Moreover, none of the errors (repetitive crime-scene photos, the prosecutor's misstatements, or sentencing-opinion errors), when considered either individually or cumulatively, resulted in prejudicial error. As previously discussed in other propositions of law, overwhelming evidence was presented that established Garrett's guilt. Thus, proposition of law No. XVI is rejected.

## M. Constitutionality

{¶ 272} In proposition of law No. XV, Garrett challenges the constitutionality of Ohio's death-penalty statutes and claims that the statutes violate international law and treaties to which the United States is a party. We have previously rejected the same arguments, *see, e.g.*, *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 279-280, and we do so again.

## IV. INDEPENDENT SENTENCE EVALUATION

{¶ 273} In proposition of law No. IX, Garrett argues that the death sentence is not an appropriate sentence for him because of his traumatic childhood, serious mental illness, low intellectual functioning, lack of a prior criminal record, and positive relationships with family and friends. Having considered Garrett's other propositions of law, we now independently review Garrett's death sentence for appropriateness and proportionality as R.C. 2929.05(A) requires.

### A. Aggravating circumstances

{¶ 274} Garrett was convicted of the three death-penalty specifications in Count Three, the aggravated murder of C.D.: (1) a course-of-conduct specification for committing multiple murders in violation of R.C. 2929.04(A)(5),

(2) a specification for purposely causing the death of a child under the age of 13 in violation of R.C. 2929.04(A)(9), and (3) a specification for committing the offense of aggravated murder to escape detection, apprehension, trial, or punishment in violation of R.C. 2929.04(A)(3).

{¶ 275} The evidence at trial supports the jury's findings of guilt as to the three aggravating circumstances. On the morning of January 5, 2018, Garrett drove to Nicole's home and brutally attacked and murdered Nicole and four-year-old C.D. as they were leaving their house. Garrett's confession, the recovery of his bloodstained clothing and the murder weapon from a storage unit at his apartment complex, the bloodstained interior of his car, his injured hand, and the coroner's testimony all established Garrett's guilt of the aggravating circumstances.

## B. Mitigating evidence presented

{¶ 276} Against these aggravating circumstances, we must weigh the mitigating factors contained in R.C. 2929.04(B). Garrett urges us to assign weight to the following mitigating factors: (1) serious mental illness, (2) low intellectual functioning, (3) lack of a prior criminal record, (4) traumatic childhood, and (5) positive relationships with family and friends.

{¶ 277} In mitigation, Garrett presented testimony from six witnesses, resubmitted Dr. Reardon's report, and made an unsworn statement. He also made a statement in allocution at the sentencing hearing.

### 1. Bernice McCoy

{¶ 278} Bernice, Garrett's mother, testified that Garrett is the oldest of her six children. Bernice was 17 years old when Garrett was born. Demond Joshua, Garrett's father, was in prison and not part of Garrett's life when Garrett was growing up. Bernice stated that Garrett was placed in foster care when he was six to ten months old because she was thought to be an unfit parent. She regained custody of Garrett when he was about two years old.

{¶ 279} Bernice and Tim Fultz ("Big Tim") began a relationship around the time that she had regained custody of Garrett. Bernice's relationship with Big Tim lasted until Garrett was six or seven years old.

{¶ 280} When Garrett was three years old, Keion, one of Garrett's brothers, died of SIDS. And Tymeika, his sister, suffered severe brain damage when she was four months old. Hospital negligence caused Tymeika's condition, and Bernice received a $600,000 settlement. Bernice stated that she had placed $10,000 into an account for Garrett that he could access when he turned 21 or 25, and Bernice does not believe that Garrett has ever accessed those funds. Garrett has maintained a relationship with Tymeika, and somewhat recently, escorted her to the prom.

{¶ 281} Bernice and Carlton McCoy began a relationship when Garrett was about 11 years old. Garrett returned to foster care after alleging that McCoy had abused Garrett's brother, Timothy. McCoy was charged with assault and endangering children based upon Garrett's allegations. However, the charges were later dropped after an investigation revealed no abuse and that Garrett had made the story up.

{¶ 282} But, as explained by Bernice, Garrett did not return home for two years and stayed with "three or four foster families, maybe five" during that time frame. After Bernice and McCoy separated, Garrett returned home and lived with his mother and two of his brothers.

{¶ 283} Garrett went to Brookhaven High School, where he played football and competed in track and field. Bernice testified that Garrett lived with her until he was 17 and then moved in with his aunt, Samantha Loveless. Garrett was accepted to the University of Akron but chose to attend Columbus State Community College. Garrett had various jobs, including as a janitor at the Ohio State University Medical Center, in a warehouse, and as a mail carrier in Westerville. He moved into his first apartment when he turned 18.

{¶ 284} Bernice stated that Garrett did not share much information about himself with the rest of the family. She did not find out about C.D. until C.D. was two and a half years old and did not meet C.D. until C.D. was three. Bernice was "shocked" when she found out that Garrett was suspected of murdering Nicole and C.D. Bernice said that Garrett "wasn't a violent person at all" and he "[n]ever had a problem with the law."

### 2. Dorinda Garrett

{¶ 285} Dorinda Garrett, Garrett's maternal grandmother, testified that she has three children and that Bernice is her middle child. Bernice started running away from home when she was 14 and would be gone for two to three weeks at a time. Bernice was 16 years old when she became pregnant with Garrett. At that time, Dorinda did not know who the father was.

{¶ 286} Bernice lived with Dorinda during her pregnancy. After Garrett was born, Bernice frequently took Garrett and ran away. Eventually, Dorinda felt that she had to report Bernice to Children Services because Garrett was dirty, had a diaper rash, and was hungry. Children Services subsequently removed Garrett from Dorinda's home when he was about two months old. He was returned approximately one month later. But three or four weeks later, Bernice resumed the same behavior.

{¶ 287} Later, Dorinda met Garrett's paternal grandmother and learned that Joshua was Garrett's father. Bernice and Garrett would stay at Joshua's home when Bernice ran away. On numerous occasions thereafter, Bernice and Garrett would leave home, Dorinda would report them missing, and Joshua's mother would call a week or so later and say that Bernice and Garrett were there and needed to be picked up. Dorinda told Bernice that Garrett was a baby and needed a stable environment. Garrett was then placed in foster care for the next two and a half years.

{¶ 288} Bernice and Big Tim then began a relationship and had a child named Timothy ("Little Tim"). Bernice also regained custody of Garrett. Dorinda often visited Bernice and Garrett. Because Big Tim was not feeding them, Dorinda often bought them lunch. Over the next few years, Big Tim and Bernice would get into arguments, and he would force Bernice to leave the house. Bernice, Garrett, and Little Tim would then stay with Dorinda for a week or so before returning to live with Big Tim. Bernice and Big Tim later separated.

{¶ 289} Bernice received a financial settlement for Tymeika's injuries. According to Dorinda, Bernice was supposed to place $10,000 from the settlement into a trust for Garrett but never did. Dorinda also stated that Garrett seemed traumatized after Keion died of SIDS. Garrett did not want to sleep and was always hovering over Little Tim. Dorinda told Bernice that she should get Garrett some mental-health care, but that never happened.

{¶ 290} Bernice and her sons left Dorinda's home around the time she obtained the settlement. Dorinda later learned that they moved into an apartment next to McCoy. Bernice isolated herself from the family after she started dating McCoy. And Dorinda had almost no contact with Garrett by the time he was nine or ten years old.

{¶ 291} Dorinda resumed her relationship with Garrett after he turned 18. Garrett moved to Reynoldsburg so that he could live closer to Dorinda. Garrett visited her once or twice a week. He would cut the grass, shovel snow, and run errands for her. He also visited her on his lunch hour when he worked as a mail carrier. Dorinda stated that Garrett worked two jobs and never got into any trouble. Dorinda could not believe that Garrett killed Nicole and C.D. because he "would have been the last one that [Dorinda] would ever thought would hurt anybody."

*3. Anthony Thornton*

{¶ 292} Anthony Thornton was Garrett's head football coach at Brookhaven High School. Thornton stated that Garrett rarely missed practices and did everything that was asked of him. Garrett was "never a problem in the classroom, in the hallways, or even on the field." Thornton was "devastated" when he found out that Garrett had committed these murders. He added: "I just knew there had to be something else that was transpiring within his life for him to make that type of decision."

*4. James Garrett III*

{¶ 293} James Garrett III is Garrett's cousin. James did not spend time with Garrett until Garrett was 15 or 16 years old. Garrett worked as a janitor at Ohio State University with James's brother. James and Garrett also spent time together at amusement parks and doing other recreational activities. Despite having spent time together, Garrett did not tell James that he had a daughter until shortly before the murders.

{¶ 294} James was "shocked, appalled" and "saddened" when he learned about the murders. He had no idea of the problems that Garrett was having in his life. James never thought Garrett would commit such crimes.

*5. Samantha Loveless*

{¶ 295} Samantha Loveless, Garrett's aunt, was in Garrett's life when he was between five and eight years old. But then Garrett was "separated from [the family] and kept from [them] for periods of time" because of "abuse and the things that were going on at home." Loveless resumed her relationship with Garrett when he was around 14 years old. She stated that Garrett would come to her home and "stay for a couple days" whenever Garrett's mother would "put him out." Loveless also testified that Garrett went to live with her on the east side of Columbus when he turned 18. Loveless described Garrett as "mild mannered, reserved. [She had] never even seen him get upset. Even through his high school

years, he [had] always done great, always excelled." Loveless added, "He pushed himself. He was very driven. * * * He was always very organized, militant; so everything was by order. He didn't miss work. He didn't miss school. He was very structured as a young kid." Loveless stated that Garrett planned on attending the University of Akron, but his mother would not sign the enrollment paperwork. But Garrett never talked about what happened because "he [had] done a good job of just concealing things and, you know, not wanting to talk bad about his mom, protecting her."

{¶ 296} Loveless continued to see Garrett a few times a week before the murders. He brought her gifts and never missed Sunday dinner with Loveless and her family. Loveless could not believe that Garrett committed the murders. She explained, "[H]e never did anything wrong. [She had] never even seen him have a temper. * * * He was a lover. He was a protector. He always was that person."

*6. Adrienne Hood*

{¶ 297} Adrienne Hood, Garrett's godmother, testified that Garrett went to high school with her oldest son. Garrett stayed at Hood's home almost every weekend, and in the summer, he spent most of his time at her home. Hood stated that Garrett was very respectful. He would cut the grass and do other chores.

{¶ 298} Hood stated that after her son was shot and killed, Garrett would check on her, bring her flowers, and visit on her birthday. Garrett called Hood "mom."

{¶ 299} Hood testified that Garrett was utterly disappointed when he was not able to enroll at the University of Akron. Hood encouraged him to attend Columbus State, take all his general-education classes, and then decide what to do. Garrett followed her advice by attending Columbus State and by working two jobs.

{¶ 300} Hood collapsed when she read that Garrett had committed the murders. She was surprised because she said, "[o]ut of all of the kids that I've

ever had at my house, I wasn't going to have to worry about him. Because he's always been a go-getter. He— I don't have to tell him anything, so I was crushed. I'm crushed still. This is devastating. All the way around it's devastating."

### 7. Dr. Reardon's report

{¶ 301} Dr. Reardon's report provided a comprehensive review of Garrett's upbringing and mental status.

### a. Relevant court records

{¶ 302} Franklin County juvenile-court records reported that Garrett's stepfather struck him with a belt in December 2006. A medical examination showed "multiple healed linear scars on [Garrett's] left shoulder blade and the back of his legs." An accompanying psychological evaluation diagnosed Garrett with a reactive-attachment disorder, which was described as a "psychological disorder typically seen in children and adolescents who have been neglected and abused."

### b. Foster care

{¶ 303} Garrett, who was born on May 20, 1993, was placed in foster care on three different occasions: (1) from September 10, 1993, to December 1, 1993, (2) from December 14, 1993, to May 12, 1995, and (3) from February 2, 2007, to February 11, 2009. Dr. Reardon commented:

[D]uring some of the most critical times for a child's emotional development * * * [Garrett] was removed from his mother's care for all but approximately three months of the first two years of his life. * * * Given circumstances like this, it is not a mystery why [Garrett] would ultimately be diagnosed with a Reactive Attachment Disorder and why he would have significant difficulties in terms of formulation of relationships, particularly

intimate relationships with caregivers and other people that a normal infant/child would not be exposed to.

### c. Interview of Bernice and McCoy

{¶ 304} Garrett is the oldest of Bernice's six children. McCoy has known Garrett since Garrett was a child. Joshua, Garrett's father, has been in prison for almost all of Garrett's life.

{¶ 305} Bernice reported that Garrett was five or six years old when she broke up with Big Tim. Subsequently, Bernice and Garrett were homeless for a significant period and lived in a shelter. Bernice and McCoy were married when Garrett was 11 years old. McCoy's son came to live with them when Garrett was 12 or 13 years old. Bernice said there were "some issues" and Garrett felt that McCoy treated his own son more favorably than Garrett.

{¶ 306} Bernice felt that Nicole "controlled [Garrett] because of their age difference, and he didn't know what to do." Bernice did not even know that Garrett was involved with Nicole until Bernice saw a pair of girl's shoes at Garrett's apartment. And Bernice never met C.D. until C.D.'s third birthday in September 2016. Bernice "kind of knew" that Garrett and Nicole had ended their relationship in the summer of 2017. Both McCoy and Bernice told Garrett, "We are here—We love you—Let's all forget the past."

{¶ 307} In the fall of 2017, Bernice saw a Facebook post from Nicole indicating that she was "going to find another daddy for [her] baby." Bernice believed that Nicole "used [C.D.] as a weapon against [Garrett]." Nevertheless, Bernice was shocked that Garrett could ever kill them, "especially * * * [C.D.] who he loved."

### d. History and clinical interview

{¶ 308} Garrett was born and raised in the Columbus area. Garrett spent years in different foster homes. Garrett described his mom as "not a fit mom."

Big Tim was involved with his mother from the time Garrett was two and a half or three years old until he was around five. Garrett described him as "kind of like dad."

{¶ 309} Garrett graduated from Brookhaven High School in 2011. Garrett, Bernice, and McCoy confirmed that Garrett had multiple concussions from playing football. He was also involved in a serious motorcycle accident in 2015, sustaining a head injury that required numerous stitches. Otherwise, Garrett has never had any significant injuries or illnesses.

{¶ 310} Garrett's employment history includes a sales position at the Columbus Dispatch, a janitorial position at The Ohio State University Medical Center, a variety of warehouse jobs, a mail-carrier position for the United States Post Office, and a forklift-driver position. He also operated two food trucks, which continued until the date of these offenses.

{¶ 311} Dr. Reardon reported that Garrett has never been arrested for any felony or misdemeanor charges other than traffic offenses.

{¶ 312} Garrett stated that Nicole was his first significant relationship. In 2012, they met at a tattoo parlor. Garrett was 19 and Nicole was 29. Nicole relocated from Long Island, New York, to Columbus and moved in with Garrett. Nicole told Garrett she could not become pregnant, so Garrett felt "tricked" when she became pregnant after eight months of dating. About one year after C.D. was born, Garrett met C.D. and told Nicole that he wanted to be there for C.D., but he did not want any other relationship with Nicole. He started seeing C.D. on a weekly basis and began paying child support.

{¶ 313} Garrett began a relationship with another woman in 2015. Nicole contacted Garrett's new girlfriend and told her that she was still seeing Garrett, so the new girlfriend ended her relationship with Garrett. According to Garrett, when he later visited C.D., Nicole would do things like come to the door naked to try to get him to have sex with her. In 2016, Garrett stopped talking to Nicole and

did not see C.D. for almost a year. In early 2017, Nicole told Garrett that if he wanted to see C.D., he needed to pay her money in addition to the child support he was paying.

{¶ 314} Garrett became frustrated with Nicole because she limited his opportunity to see C.D. By late spring or early summer of 2017, Garrett stopped paying extra money to see C.D. Consequently, Nicole stopped letting Garrett see C.D. By midsummer, Garrett stopped paying child support. Later that summer, Garrett became involved with a new girlfriend. She became pregnant and got an abortion. Garrett reported that it was "not [his] choice" and that "it took a toll." Dr. Reardon commented that "[f]rom a psychodynamic point of view, this was then two more significant losses—the loss of his relationship with his daughter [C.D.] because of Nicole['s] * * * refusal to let him see her, and the loss of another child when his girlfriend * * * had an abortion."

{¶ 315} Garrett reported that "the convergence of all these factors" was the "tipping point." He had also received an email stating that because he was in arrears with child support, if he was stopped for any kind of traffic offense, his driver's license would be confiscated, which meant he could not get to work. In this state of mind, Garrett went to Nicole's house and killed Nicole and C.D. When asked why he had killed C.D., Garrett told Dr. Reardon, "I refused to let anyone else raise my child. I didn't want my daughter to grow up without a dad like I had. I couldn't do that to her." Garrett said that afterwards, he "didn't care about nothing—I wish I wouldn't have done it—I was just in a state of shock and disbelief of what I had done."

### e. Psychological testing

{¶ 316} Testing showed that Garrett has a full-scale IQ of 85 on the Wechsler Adult Intelligence Scale, Fourth Edition, indicating that his intellectual functioning is in the low-average range. Results from the Test of Memory Malingering, the Miller Forensic Assessment of Symptoms Test, and the

Structured Inventory of Malingered Symptomology indicated no evidence of exaggeration of symptoms or malingering of psychological problems.

{¶ 317} The profiles for the main clinical scales of the Personality Assessment Inventory, Revised, showed that only Garrett's mania scale was outside the normal limits. Dr. Reardon stated that such individuals are "typically impulsive and lack judgment in situations which leads to significant impairment in terms of decision making. They may experience flight of ideas and may be delusional in terms of their thinking." The hypervigilance subscale for paranoia was also significantly elevated, which reflects a predisposition to distrust others and to be hypervigilant and guarded about interactions with others. Dr. Reardon emphasized the extreme cognitive rigidity of Garrett's response style, which reflected the "all or nothing thinking that [Garrett] ha[d] developed."

{¶ 318} Results from the Impact of Event Scale showed that Garrett's intrusion scale score was "approximately 1½ times the average score for a traumatized population and was more than 11 times the average score for a non-traumatized control population." And his significantly elevated avoidance-scale score "suggests that avoidance or psychic numbing are primary defense mechanisms for [Garrett] with regard to the effects of this traumatic situation."

{¶ 319} Dr. Reardon also reported that results from the Dissociative Subtype of Posttraumatic Stress Disorder Scale "suggest a significant likelihood of the presence of dissociative symptoms and evidence consistent with a derealization/depersonalization episode at the time of the events of 01/08/18, specifically with regard to [Garrett's] actions regarding his daughter [C.D.]" Dr. Reardon cited these results as "further evidence" that Garrett had "an acute dissociative episode at the time of the offense with regard to his daughter [C.D.]"

### f. Diagnoses and expert opinions

{¶ 320} Referring to the *Diagnostic and Statistical Manual of Mental Disorders* (5th Ed.2013) ("DSM-5"), Dr. Reardon diagnosed Garrett with:

(1) "Reactive Attachment Disorder, Persistent," (2) "Unspecified Bipolar and Related Disorder," and (3) "Schizoid Personality Disorder * * * With acute dissociative episode."

{¶ 321} Dr. Reardon opined that as Garrett's "emotional condition deteriorated and he vacillated between feelings of anger and rage toward Nicole and feelings of hopelessness and being lost with regard to [C.D.], his reasoning ability deteriorated to the point where he actually thought and verbalized that 'doing what he ended up doing was the only way out.' " Dr. Reardon concluded:

> Although his state of mine [sic] was clearly severely deranged at the time of his assault against Nicole Duckson, it appears that from a legal point of view he probably was aware that what he was doing was against the law. At that point, he was simply "over the edge" and unable to control his actions. It is my opinion to reasonable psychological certainty, however, that at the time of his assault and homicide of his daughter, [C.D.], * * * Garrett was in an acute dissociative episode. As a result of this, there was a severe disruption of the normal integration of consciousness, memory, emotion, and behavior. In this severely impaired emotional state, he was unable to appreciate the wrongfulness of his acts because he was in the dissociative reaction.

### 8. Garrett's statements

{¶ 322} Garrett made the following unsworn statement to the jury:

> First and foremost, I want to tell—Tell everybody that I'm sorry for what I did. I did it and I'm sorry. I want to say I'm sorry

to the family, to Mr. Duckson, especially the parents, and to the Duckson family. And I'm sorry to my family because you lost a family member as well and this is going to live with me for the rest of my life. It's been living with me for the rest of my life and I'm just—I'm sorry.

{¶ 323} Before sentencing, Garrett presented a final statement to the court in allocution, stating, "I just have it in my heart again to say to the family that I'm sorry and that's it."

### C. State's rebuttal

{¶ 324} The state reintroduced Dr. Martell's trial-phase testimony and report in rebuttal.

{¶ 325} Dr. Martell wrote in his report that Dr. Reardon's test interpretations were "generally reasonable and consistent with the findings reflected in the test data." However, Dr. Martell wrote that "Dr. Reardon's diagnosis of Schizoid Personality Disorder is contraindicated by data from the [Personality Assessment Inventory]." While a schizoid personality disorder is characterized by a lack of interest in social relationships, Dr. Martell opined that Garrett's test results indicate very strong needs for attention and affiliation. Dr. Martell further wrote that Dr. Reardon's use of the Impact of Event Scale "d[id] not reflect [Garrett's] mental state at the time of the offenses, but rather his reaction to what he had done almost a year later." And Dr. Martell wrote that Dr. Reardon deviated from the standardized administration of the Dissociative Subtype of the Posttraumatic Stress Disorder Scale by asking Garrett whether he had experienced specific dissociative symptoms at the time of the offense, rather than " 'in the past month' as intended."

{¶ 326} Dr. Martell explained that Dr. Reardon presented "no evidence from Mr. Garrett's history that he has experienced manic episodes in the past, or

that he was exhibiting symptoms of mania at the time of the killings." He observed that "[i]f * * * Garrett does indeed suffer from an Unspecified Bipolar Disorder; it is a disorder that is episodic."

{¶ 327} Dr. Martell also disagreed with Dr. Reardon's findings that Garrett was in a dissociated state when he killed C.D.

### D. Weighing

{¶ 328} Nothing in the circumstances of the offenses is mitigating. Garrett went to Nicole's home after receiving an email threatening him with incarceration or loss of his driver's license for nonpayment of child support. Garrett began stabbing Nicole as she came out the door; then he stabbed C.D. multiple times in the head, face, and torso when she tried to run away. Garrett fled the scene and hid the knife and clothes. These horrific crimes lack any mitigating features.

{¶ 329} The statutory mitigating factors under R.C. 2929.04(B) include R.C. 2929.04(B)(1) (victim inducement), (B)(2) (duress, coercion, or strong provocation), (B)(3) (mental disease or defect), (B)(4) (youth of the offender), (B)(5) (lack of a significant criminal record), (B)(6) (accomplice only), and (B)(7) (any other relevant factors).

{¶ 330} R.C. 2929.04(B)(1), (2), and (6) are not applicable. And Garrett's age of 24 at the time of the murders only nominally satisfies R.C. 2929.04(B)(4)—i.e., "youth of the offender"—and is entitled to little weight. *See State v. Green*, 66 Ohio St.3d 141, 153, 609 N.E.2d 1253 (1993) (age of 24 was entitled to "slight weight"); *State v. Post*, 32 Ohio St.3d 380, 394, 513 N.E.2d 754 (1987) (age of 24 was "not a mitigating factor"). However, the mitigating evidence shows that other factors also deserve weight.

{¶ 331} First, Garrett's mental-health history is entitled to some weight under R.C. 2929.04(B)(3) and (7). Defense counsel made a tactical decision not to raise R.C. 2929.04(B)(3) during mitigation because counsel did not want to risk

annoying the jury after it had already rejected Garrett's NGRI defense. But sanity or insanity is not the issue in the penalty phase. Dr. Reardon testified that Garrett lacked substantial capacity to appreciate the criminality of his conduct and that Garrett suffers from a bipolar and related disorder.[3] But Dr. Martell's report indicated that if Garrett does suffer from an unspecified bipolar disorder, the disorder is "episodic." In sum, the limited evidence about Garrett's possible bipolar diagnosis is not dispositive. Nevertheless, Dr. Reardon's testimony that Garrett suffers from a bipolar condition deserves weight under R.C. 2929.04(B)(7).

{¶ 332} Garrett's IQ of 85, which indicates that his intellectual functioning is in the low-average range, is also entitled to some weight. *See Froman*, 162 Ohio St.3d 435, 2020-Ohio-4523, 165 N.E.3d 1198, at ¶ 183 (IQ of 86 was entitled to "some weight"); *Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, at ¶ 279 (IQ of 84 entitled to "appropriate weight").

{¶ 333} Second, Garrett's lack of a prior criminal record is entitled to significant weight in mitigation under R.C. 2929.04(B)(5). *See Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, at ¶ 199; *Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, at ¶ 115.

{¶ 334} Third, Garrett experienced a dysfunctional upbringing. He was born to a teenage mother and an absent father. He spent much of his early life in a series of foster homes. Before Garrett was six years old, he had experienced the trauma of his brother's death and his sister's brain injury. Nevertheless, he graduated from high school and attended some college. And this court has

---

3. Under 2020 Am.Sub.H.B. 136, which took effect during the pendency of this appeal, a person who has been diagnosed with a "serious mental illness," which includes bipolar disorder, R.C. 2929.025(A)(1)(a)(iii), is ineligible for a death sentence if the person raises the issue before trial and proves by a preponderance of the evidence that the illness "significantly impaired the person's capacity to exercise rational judgment," R.C. 2929.025(A)(1)(b), with respect to either conforming to the law or appreciating the nature, consequences, or wrongfulness of the person's conduct. *See* 2929.025(C) through (F). Garrett's bipolar condition and its relation to the murders was not litigated at trial.

"seldom ascribed much weight in mitigation to a defendant's unstable or troubled childhood." *Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716, at ¶ 174. Still, Garrett's dysfunctional upbringing is entitled to some weight under R.C. 2929.04(B)(7). *See State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, ¶ 208.

{¶ 335} Fourth, we give weight to evidence that Garrett has been a hard worker and consistently employed. *See Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 327.

{¶ 336} Fifth, we give weight to the support that he has from family members who testified on his behalf. *See State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, 23 N.E.3d 1023, ¶ 301.

{¶ 337} Finally, Garrett's remorse for killing Nicole and C.D. is entitled to weight. Significantly, Garrett's remorse was accompanied by a complete confession that aided the police in completing their investigation.

{¶ 338} Garrett's decision to murder of Nicole and C.D. was senseless, horrific, and terrible. But Garrett presented significant mitigating evidence. He was raised by a teenage mother, spent much of his early years in a series of foster homes, and experienced tragedy with his younger brother's death and his sister's permanent brain injuries. Garrett's mental-health problems undoubtedly played a role in C.D.'s murder. However, there is no evidence that he received any treatment for his mental-health problems, even though he was diagnosed with a reactive-attachment disorder in 2007.

{¶ 339} Garrett's lack of a criminal record and the testimony about his mental-health problems under R.C. 2929.04(B)(3), (5), and (7) provide the strongest mitigation. We choose, however, not to accord great weight to the mitigating factor of lack of a criminal history under R.C. 2929.04(B)(5) because Garrett's entry into the criminal ranks was "terrifyingly brutal." *See State v. Grant*, 67 Ohio St.3d 465, 486, 620 N.E.2d 50 (1993). We also decline to give

overriding weight to Garrett's mental-health problems under R.C. 2929.04(B)(3) and (7), particularly in view of the conflicting expert testimony about Garrett's mental state at the time of the murders. Moreover, as the trial court noted in its sentencing opinion, Garrett killed Nicole and C.D. "after carefully weighing the benefits and costs of doing so."

{¶ 340} As for the aggravating circumstances, the commission of multiple murders carries great weight. The specification pertaining to murdering a child under 13 is also entitled to great weight because it involves the murder of a young and vulnerable victim. And the escaping-detection specification adds more weight to the state's side of the scale. *See State v. Lawson*, 165 Ohio St.3d 445, 2021-Ohio-3566, 179 N.E.2d 1216, ¶ 183.

{¶ 341} This case is decidedly unlike the two most recent cases in which we have found that the aggravating circumstances did not outweigh the mitigating circumstances beyond a reasonable doubt, *State v. Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, and *Graham*, 164 Ohio St.3d at 187, 2020-Ohio-6700, 172 N.E.3d 841. Johnson and Graham were both 19-year-old defendants who "entered a residence to commit robbery and murdered a [single] person inside." *Graham* at ¶ 215. By contrast, Garrett was 24 years old; he traveled to Nicole's home, lay in wait, and then killed Nicole and his four-year old daughter.

{¶ 342} We conclude that the mitigating evidence collectively pales in significance to the aggravating circumstances of Garrett's brutal murder of four-year-old C.D. Thus, upon independent weighing, we find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

### E. Proportionality

{¶ 343} As a final matter, we must determine whether the sentence is appropriate and proportionate to the penalty imposed in similar cases. R.C. 2929.05(A). We have previously upheld death sentences for a course of conduct under R.C. 2929.04(A)(5). *See Trimble,* 122 Ohio St.3d 297, 2009-Ohio-2961,

911 N.E.2d 242, at ¶ 329; *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 182. And we have upheld the death sentence as punishment for other child murders under R.C. 2929.04(A)(9). *See State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 298; *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 206. Finally, we have upheld the death penalty for other murders to avoid detection, apprehension, trial, or punishment under R.C. 2929.04(A)(3). *See State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 148; *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 196.

## V. CONCLUSION

{¶ 344} For the foregoing reasons, we affirm the convictions and death sentence. But we note that the trial court erred in imposing a 12-month sentence for Count Four in the September 14, 2019 judgment entry after imposing a 36-month sentence for Count Four at the sentencing hearing. The trial court also erred when, at Garrett's sentencing hearing and in the September 14, 2019 judgment entry, it imposed a sentence of life imprisonment without parole for Count One but then indicated that Garrett was eligible for parole in the September 16, 2019 entry.

{¶ 345} Accordingly, we remand this case to the trial court for it to issue a nunc pro tunc entry conforming the September 14, 2019 judgment entry and the September 16, 2019 entry to the sentence that was imposed at the sentencing hearing.

Judgment affirmed
and cause remanded.

O'CONNOR, C.J., and KENNEDY and DEWINE, JJ., concur.

DUHART, J., concurs in part and dissents in part, with an opinion joined by DONNELLY and STEWART, JJ.

MYRON C. DUHART, J., of the Sixth District Court of Appeals, sitting for BRUNNER, J.

———————————

**DUHART, J., concurring in part and dissenting in part.**

{¶ 346} I agree with the majority's decision to affirm Kristopher Garrett's convictions, but I disagree with the majority's holding that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. The majority does not give sufficient weight to Garrett's (1) serious mental-health issues, (2) lack of a prior criminal record, and (3) dysfunctional childhood. Accordingly, because I would reverse Garrett's death sentence, I dissent in part.

{¶ 347} The majority does not give sufficient weight in mitigation to the findings made by Dr. James P. Reardon, a forensic psychologist, that at the time of the offenses, Garrett suffered from a "severe mental disease" and was in a dissociative state and therefore "was not able to appreciate the wrongfulness of the acts charged." R.C. 2929.04(B)(3) allows the fact-finder to consider whether "at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of [his] conduct or to conform [his] conduct to the requirements of the law." This court has previously stated that a psychological report regarding a defendant's sanity is relevant to establishing mitigating evidence under that section because the "issues involved are similar: whether a 'mental disease or defect' existed and, if so, whether and to what degree it may have impaired his cognition and volition." *State v. Cooey*, 46 Ohio St.3d 20, 33, 544 N.E.2d 895 (1989), *superseded by constitutional amendment on other grounds as stated by State v. Smith*, 80 Ohio St.3d 89, 102, 684 N.E.2d 668 (1997), fn. 4.

{¶ 348} Although the jury rejected Garrett's defense of not guilty by reason of insanity during the trial phase, Dr. Reardon's initial report about Garrett's mental state at the time that Garrett committed the offenses provided

compelling mitigating testimony. Dr. Reardon's report stated that Garrett had "virtually no recollection for the actual events of that morning [January 5, 2018,] once he had stabbed Nicole Duckson. He appeared to be almost completely unaware of the actual magnitude of the assaults."

{¶ 349} Dr. Reardon opined to a reasonable degree of psychological certainty that Garrett was in a dissociative state "during the time of the actual offense." Dr. Reardon explained that because of being in a dissociated state, Garrett had "no conscious recollection of the degree or magnitude of his actions on the morning of the offense. This is particularly true as it pertains to his daughter [C.D]. In fact, his perception is that he had no choice where she was concerned because he 'couldn't abandon her' (like he had been abandoned by his father)." Clearly, this evidence establishes that Garrett "lacked substantial capacity to appreciate the criminality of [his] conduct or to conform [his] conduct to the requirements of the law," R.C. 2929.04(B)(3).

{¶ 350} Garrett was diagnosed with persistent reactive-attachment disorder. According to Dr. Reardon, this disorder does not allow "normal attachment * * * of a child to significant people in their environment, typically mom and dad initially, maybe grandparents." Garrett was also diagnosed with "schizoid personality disorder with acute dissociative episode." According to Dr. Reardon, a person who has been diagnosed with schizoid-personality disorder copes with life by "kind of stay[ing] separate from people, * * * [doesn't] connect, * * * live[s] [his] life with people but apart from people."

{¶ 351} Garrett was also diagnosed with unspecified bipolar disorder. Dr. Reardon testified that bipolar disorders are "disorders where there is a dysregulation of energy, of thought, of emotion," and that people who are diagnosed with bipolar disorder "tend to be very high energy." During the pendency of this appeal, the General Assembly enacted 2020 Am.Sub.H.B. 136, which recognizes that a person who has been diagnosed with a "serious mental

illness," R.C. 2929.025(A)(1), is ineligible for a death sentence when the person raises the issue before trial and proves by a preponderance of the evidence that the illness "significantly impaired the person's capacity to exercise rational judgment," R.C. 2929.025(A)(1)(b), with respect to either conforming to the law or appreciating the nature, consequences, or wrongfulness of the person's conduct. *See* R.C. 2929.025(C) through (F). R.C. 2929.025(A)(1)(a)(iii) includes bipolar disorder as one of the "serious mental illness[es]." Dr. Daniel Martell, the state's forensic psychologist, did not dispute that Garrett suffered from bipolar disorder. He stated that if Garrett did suffer from a bipolar disorder, it was a disorder that was episodic.

{¶ 352} In *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 831, ¶ 214, this court recognized that developments in case law increased the weight to be given to the mitigating factor of a defendant's mental health. Here, the majority attempts to distinguish *Graham* based on the difference in ages between the defendants (Graham was 19 at the time in which he committed the offenses and Garrett was 24) and the nature of the offenses. However, such differences do not diminish the significance of Garrett's serious mental illness and how his mental illness affected his decision-making process on January 5, 2018. And just as Graham did not receive adequate treatment for his mental-health issues (oppositional defiant disorder and conduct disorder), *id* at ¶ 209, there is no evidence before this court that Garrett received adequate treatment for his mental-health issues, even though he was diagnosed with having reactive-attachment disorder in 2007. In light of *Graham* and the General Assembly's recognition that bipolar disorder is a serious mental illness, I would give considerably more mitigating weight to Garrett's mental-health issues.

{¶ 353} Moreover, the trial court committed a serious error by not instructing the jury on Garrett's lack of a criminal record under R.C. 2929.04(B)(5). Although the trial court gave the jury an instruction on R.C.

2929.04(B)(3), it failed to give the jury an instruction on R.C. 2929.04(B)(5) even though Garrett presented mitigating evidence under R.C. 2929.04(B)(3) and (5). Indeed, it is highly improbable that the jury gave sufficient weight to Garrett's lack of a prior criminal record just because the trial court had instructed the jury on the catchall factor, R.C. 2929.04(B)(7), which allows the jury to consider "[a]ny other factors that are relevant." The majority declines to accord great weight to this factor because of the " 'terrifyingly brutal' " nature of the offenses. Majority opinion, ¶ 339, quoting *State v. Grant*, 67 Ohio St.3d 465, 486, 620 N.E.2d 50 (1993). But because any aggravated murder is, by nature, horrific and "terrifyingly brutal," if we accept the majority's rationale, then any mitigating evidence that is presented under R.C. 2020.04(B)(5) may be dismissed in virtually every capital case.

{¶ 354} Garrett's background is also entitled to more weight than the majority accords. The evidence in this case demonstrates that Garrett had a dysfunctional upbringing. Dr. Reardon's report states that Garrett was subjected to "severe neglect and abuse * * * during his infancy, childhood, and adolescence." Garrett was born to a teenage mother, his biological father spent time in prison, and Garrett lived much of his early life in a series of foster homes. Garrett's infant brother died when Garrett was three-and-a-half years old and his sister suffered a life-altering brain injury when Garrett was approximately five. The majority notes that this court has " 'seldom ascribed much weight in mitigation to a defendant's unstable or troubled childhood.' " Majority opinion at ¶ 334, quoting *State v. Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716, ¶ 174. But Garrett's upbringing presents an exception to what this court stated in *Kirkland*, particularly since Garrett seemed to have overcome his dysfunctional childhood and because his actions on January 5, 2018, were uncharacteristic of who he had become.

**{¶ 355}** Because these mitigating factors are entitled to more weight than the majority affords them, I conclude that when viewed cumulatively, "the mitigation evidence militates against imposing the death sentence." *See State v. Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, ¶ 139.

DONNELLY and STEWART, JJ., concur in the foregoing opinion.

————————

G. Gary Tyack, Franklin County Prosecuting Attorney, and Seth L. Gilbert, Assistant Prosecuting Attorney, for appellee.

Carpenter, Lipps, & Leland, L.L.P., Kort Gatterdam, and Erik P. Henry; and Timothy Young, Ohio Public Defender, and Melissa Jackson and Erika LaHote, Assistant Public Defenders, for appellant.

————————